**ROBO SALES, INC., a Missouri corporation, Respondent,**

v.

**Howard L. McINTOSH and Marjory L. McIntosh, Husband and Wife, Appellants.**

**No. 56514.**

Supreme Court of Missouri, Division No. 1.

May 14, 1973.

Rehearing Denied June 11, 1973.

Joseph J. Kelly, Jr., Howard F. Sachs, Kansas City, for respondent; Spencer, Fane, Britt & Browne, Kansas City, of counsel.

Cottingham, Williamson, Gibson & Leonard, James S. Cottingham, W. Dudley Leonard, Independence, for appellant.

HIGGINS, Commissioner.

Action for specific performance of option to purchase real estate contained in lease agreement; and counterclaim for reformation of legal description to reduce size of subject real estate. Appeal (taken prior to January 1, 1972) is from decree granting specific performance and denying reformation.

The agreement was executed March 3, 1966, between defendants Howard L. and Marjory L. McIntosh, husband and wife, lessors, and Michael D. and Martha Edith Selders, husband and wife, lessees. Its subject was a tract of land on Noland Road in Independence, Missouri, by legal description, to be improved and used for a Robo Car Wash. Paragraph 11 gave lessees an option to purchase.

Mr. and Mrs. Selders, with consent of Mr. and Mrs. McIntosh, assigned their rights May 2, 1968, to plaintiff Robo Sales, Inc., for valuable consideration. Robo exercised the option to purchase August 5, 1968, defendants failed to consummate the sale, and the suit for performance was filed November 19, 1968. Defendants counterclaimed for reformation, alleging an erroneous legal description through mutual mistake.

Plaintiff had no surveys made of subject premises prior to the assignment by Mr. and Mrs. Selders. Mr. Selders furnished the assignee a survey of the tract dated October 10, 1963. Such survey tracked the legal description contained in the lease and showed a triangular tract on the west side of Noland Road. The east line of the tract ran from a true point of beginning in Noland Road southeasterly in two segments of 175.40 feet and 99.75 feet to intersection with the Missouri Pacific Railroad right of way; the west line ran northwesterly along the railroad right of way 293.70 feet; the north line ran thence east 167.50 feet to the point of beginning. Plaintiff had a survey made of the premises July 16, 1968, which incorporated this description and showed certain improvements on the property, e. g., the concrete slab Robo Car Wash and appurtenant concrete driveways, gasoline pump islands, utility poles and guys, and a 6'-high chain link fence running from a point in the railroad right of way easterly into the tract about one half the distance of its north line, an undefined number of feet south of the north line and a short undefined distance north of the north car wash driveway. If an imaginary line were extended along the line of the fence on easterly to Noland Road, a strip of ground would be created with dimensions of 23.71 feet on the east side, 23.83 feet on the west, 151.95 feet on the south, and, of course, 167.50 feet on the north. This is depicted by a revision of the July, 1968, survey made December 23, 1968, for that purpose for defendants.

Mr. A. H. Myers, president of Robo, had never been able to locate the boundary lines of the property until after the survey of July 16, 1968. He and Mr. McIntosh had made previous efforts to ascertain the exact location of the property but were unsuccessful. An accountant for Robo, using the 1963 survey which included the disput-

ed strip, computed the square footage of the tract for purposes of ascertaining the value of the tract and its proper size for a car wash. Mr. Myers, on behalf of Robo, relied on the square footage thus obtained as a deciding factor in whether to accept the lease assignment.

Mr. Selders was aware of the fence when he first examined the property for location of the Robo Car Wash. The October, 1963, survey was presented to him by the real estate agent as being the property he was leasing. He never had an intention to lease or hold option to purchase any property north of the chain link fence and he did not use any of such property during his tenancy.

Mr. McIntosh believed the fence to be the northern boundary of the property. According to him, Mr. Selders wanted to use Mr. McIntosh's driveway which was in the 23-feet strip now in dispute. Mr. McIntosh said that it was not possible so Mr. Selders installed his driveway south of and almost immediately adjacent to the McIntosh drive.

Also, according to Mr. McIntosh, Mr. Myers attempted to buy additional property north of the fence from him prior to the July, 1968, survey; and he was not aware of the scope and effect of the legal description until advised by Mr. Myers.

Mr. Myers's version of the negotiations for additional land was that they revealed the inability of defendants to locate markers showing the property lines and were concluded by Mr. Myers's decision to obtain the July, 1968, survey.

Mr. Arthur Eggiman, realtor, negotiated the lease between defendants and Mr. and Mrs. Selders. He procured the legal description which was available to him on account of negotiations he previously had undertaken for Mr. McIntosh with DX Sunray Oil Company. He was under pressure and without time to obtain another description. He felt it was the intention of the parties to the lease that the fence was to be the north line.

Mr. Myers stated the land in question could not be replaced at another location, and Robo was current in its payments under the lease agreement; defendants would recognize the option to purchase to the extent of the land south of the chain link fence.

Appellants make reference to the following findings of fact of the trial court:

"10. There was a mutual mistake between the original Lessors and Lessees to the Lease with reference to the description of the north boundary of the leased property in that it was understood between these parties that the north boundary of the property was to be a certain chain link fence and a line continuing on east from same, said intended boundary being approximately 23 feet south of the north boundary described in said Lease";

and to the following conclusions of law of the trial court:

"6. By reason of plaintiff's president, A. H. Myers, Sr., inspecting the subject premises prior to the assignment by Michael D. Selders and Martha Edith Selders to plaintiff, plaintiff did *not* have notice of the mutual mistake of the original Lessors and Lessees as to the real estate to be covered by the March 3, 1966 Lease.

"7. Due to the location of the chain link fence on the subject property, and the irregular shape of the property, A. H. Myers, Sr., plaintiff's president, did *not* have knowledge of such circumstances which in common reason and prudence ought to have put him to inquiry as to the actual northern boundary line of the subject property."

Respondent makes reference to the following findings of fact of the trial court:

"14. In acquiring the assignment of the Lease, Plaintiff Robo Sales, Inc., relied upon a 1963 survey provided by the original Lessors and Lessees as to the square

footage of the area and as to the frontage on Noland Road, without knowing where the northern or southern boundaries of the leased premises were with reference to landmarks.

"15. Plaintiff had no notice of any mutual mistake between the original Lessors and Lessees to the March 3, 1966 Lease as to the real estate to be leased under that written lease agreement."

Appellants contend the court erred in failing to grant reformation of the legal description in the lease "because there was a mutual mistake * * * between defendants and the lessees-assignors * * * and therefore defendants are entitled to reformation of the lease between those standing in privity with the lessees."

Appellants take finding No. 10 of mutual mistake between the defendants-lessors and the original lessees, the Selders, and, citing 6 C.J.S. Assignments § 99, assert that when plaintiff became the assignee of the Selders it took the lease subject to the same defects it had in their hands.

Respondent takes the position that it, as an assignee for value of the lessees' interest, which included an option to purchase, was not subject to reformation rights which might exist in defendants against their lessees.

■ The rule with respect to reformation of a written agreement, in this case the lease with option to purchase, on the ground of mutual mistake is, as stated by appellants from Schneider v. Bulger, 194 S.W. 737, 739 [3] (Mo.App.1917): "A court of equity will exercise its power to reform instruments, and not only as between the original parties, but as to those claiming under them in privity, such as

* * * assigns, grantees * * * or purchasers from them with notice of the facts." See also Leimkuehler v. Shoemaker, 329 S.W.2d 726, 730 [1–3] (Mo. 1959), quoting Walters v. Tucker, 308 S. W.2d 673, 675 [2–4] (Mo.1957). See also Anno: "Right to reformation of contract or instrument as affected by intervening rights of third persons." 79 A.L.R.2d 1180, 1186 (1961).

■ The difficulty in appellants' position under these authorities is that they have not shown conclusively that respondent had notice of the mutual mistake existing between the original parties to the lease.

Appellants' recognition of their difficulty is demonstrated by their further assertion that respondent's president, Mr. Myers, "clearly shared" the mutual mistake existing between the original parties to the lease by his attempted purchase of property north of the fence and his prior visits to the premises. Cf. Fischer v. Dent, 259 Mo. 86, 167 S.W. 977 (1914). This assertion is, however, contrary to the trial court's quoted findings Nos. 14 and 15, and conclusions Nos. 6 and 7, made in resolution of conflicting evidence on the issue, all of which were matters peculiarly for the trier of fact. Shumate v. Reavis, 49 Mo. 333, 336 (1872); Drey v. Doyle, 99 Mo. 459, 12 S.W. 287, 289 (1889); Rule 73.01(d).

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court.

All of the Judges concur.