George E. BOLLINGER et al., Appellants,

v.

Van SIGMAN and Virginia Sigman,
Respondents.

No. KCD 26868.

Missouri Court of Appeals,
Kansas City District.

March 3, 1975.

Albert Copaken, Sylvia Copaken, Kansas City, for appellants.

Howard W. Bevins, Raytown, for respondents.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

DIXON, Judge.

Plaintiffs appeal from an order of the trial court sustaining the defendants' motion for judgment at the close of the plaintiffs' case. Plaintiffs' petition sought reformation of two deeds on the ground of mutual mistake. The trial court filed a written opinion containing findings of fact and conclusions of law. That opinion rests on the trial court's finding that there was insufficient evidence to support a finding of mutual mistake as to either deed.

Of necessity, the facts are developed entirely from evidence offered by the plaintiffs and the reasonable inferences arising from that evidence.

The co-plaintiffs in the action are Mr. and Mrs. George Bollinger and their daughter and son-in-law, Mr. and Mrs. Richard Stroud. In 1956, George Bollinger purchased Lot 69 and Lot 70, Sterling Meadows Resurvey, Jackson County, Missouri. Lot 70 abuts and is directly north pf Lot 69; the lots face east onto Sterling Avenue. Lot 69 extended 137 feet east to west and 105 feet north to south. Mr. Bollinger built and lived in a house on Lot 70.

In 1965, Mr. Bollinger had the south 80 feet of Lot 69 surveyed and staked. He then submitted a plot plan to the City of Kansas City in order to obtain a permit to build a house on the south 80 feet of Lot 69. Having surveyed and staked the south 80 feet of Lot 69, Mr. Bollinger planted large hedges four inches north of the north boundary line of the south 80 feet of Lot 69. Bollinger thereafter used all of Lot 70 and the northern 25 feet of Lot 69 as the backyard to his house on Lot 70. He ows Resurvey, . . . ." The mortgagee 80 feet of Lot 69 to the Strouds for four years.

In March, 1970, the Bollingers and the Strouds entered into the first warranty deed in question. Under that deed, Bollinger purported to transfer to the Strouds, "Lot 69, Sterling Meadows Resurvey,

. . . ." The Strouds lived on the property in question until August, 1971, when they transferred property by warranty deed to the defendants Sigman.

The circumstances surrounding the sale to the Sigmans are important. The Strouds listed their property for sale with Pat Frisbie, a real estate agent of the Wood Real Estate Company. On the last day of the exclusive listing with the Woods Agency, an agent of the Eugene Brown Real Estate Agency, Francis Scott, showed the property to the defendants Sigman with the permission of Frisbie. Late that night, Scott told the Strouds that the Sigmans were interested in making an offer for the house. The Strouds signed a contract to sell the property for $28,000 on July 27, 1971. The deed was signed August 23, 1971. The deed purports to transfer to the Sigmans "Lot 69, Sterling Meadows Resurvey, . . . ." The mortgagee of the property for the Sigmans was Safety Federal Savings and Loan Association. The address of the property which Bollinger transferred to the Strouds and the Strouds transferred to the Sigmans is 4815 Sterling Avenue. It is undisputed that in the yard directly behind the house, there are large, bushy, thick hedges approximately ten feet tall along the northern, eastern and southern borders of the property.

Approximately eight months after he purchased the property, Mr. Sigman had a series of conversations with Mr. Bollinger; he questioned Mr. Bollinger about where the exact property lines were between their properties. When it became clear to all the parties that they could not agree where the exact property lines were, the plaintiffs filed this suit in September of 1972.

■ One of the grounds upon which the defendants based their motion for judgment at the close of the plaintiffs' case was that the plaintiffs are not real parties in interest. The trial court did not specifically address itself to that issue in its findings. However, it is clear under the applicable case law that at least the plaintiffs

Stroud are real parties in interest. Robo Sales, Inc. v. McIntosh, 495 S.W.2d 420 (Mo.1973); Snider v. Miller, 352 S.W.2d 161 (Mo.App.1961); 76 C.J.S. Reformation of Instruments § 70, p. 425.

■ The defendants' motion for judgment at the close of plaintiffs' case submitted the case to the court and the court's judgment is, on appeal, reviewed *de novo* with deference to the trial court's ability to judge the credibility of the witnesses. The judgment will not be reversed unless clearly erroneous. Section 510.310 RSMo 1969, V.A.M.S.

■ In an action for reformation, it is not necessary to show that the parties to the instrument agreed upon any particular language to be used in the instrument; but it is sufficient to show that they agreed to accomplish a particular object by the instrument and that such instrument, as executed, is insufficient to effectuate their intentions. Shaffer v. Dalrymple, 507 S.W.2d 65 (Mo.App.1974); Hoffman v. Maplewood Baptist Church, 409 S.W.2d 247 (Mo.App.1966).

■ As noted, the plaintiffs' sought reformation of the deed from Bollingers to Strouds and also from Strouds to Sigmans. The trial court found there was insufficient evidence for the reformation of these deeds. The trial court was correct in holding that there could be no mutual mistake in the deed from Bollingers to Strouds. Mr. Bollinger had assisted in surveying the south 80 feet of Lot 69, and he knew the boundaries of Lot 69; he cannot be held to have been mistaken as to the land he intended to convey to his daughter and son-in-law. Affirmance as to that portion of the trial court's judgment leaves for disposition the balance of the appeal.

On the portion of the appeal relating to plaintiffs Stroud, the issue may be simply stated. Did plaintiffs Stroud present competent evidence showing that the Sigmans intended to buy the same property which the Strouds intended to sell and was the

property which they mutually intended to buy and sell the originally surveyed tract, the South 80 feet of Lot 69? The trial court found specifically that the plaintiffs presented no evidence showing that the defendants intended to purchase any real estate "other than that reflected in the real estate sales contract and warranty deed as executed and delivered."

■ The evidence is overwhelming that the Strouds, the plaintiffs, thought they owned only, and intended to sell only, the house at 4815 Sterling and the land immediately behind it as bounded by the tall hedges on the north. The plaintiffs' evidence was that that intent embraced only the south 80 feet of Lot 69. Mrs. Stroud testified that the boundary lines for the yard was the "tall hedge" on both sides of the yard. She said that she had "no idea" that Lot 69 included 25 feet of her father's backyard. She said that all she ever knew they owned was from "hedge to hedge." When asked by her attorney if she knew what Lot 69 purported to be, she replied, "I just knew it was our yard, you know." It is apparent that Mrs. Stroud knew where the exact north boundary line of the property was because she knew that the hedge had been planted four inches north of that boundary line. She testified that she thought Lot 69 was not more than 80 feet wide. She also knew that there were survey stakes "in the front where the hedge was planted." When Mrs. Stroud was asked if she intended to sell what she owned, she answered, "Yes, I wanted to sell the 80 feet from the survey— one survey post to the other." The extent of the property which the Strouds intended to sell is also evidenced by the way the property was listed for sale by the Strouds with the Woods Real Estate Agency. The listing described the property as "hedge as fence in back yard."

Mr. Stroud said that they thought the boundary line of their property was "around 80–85 feet and ranged from hedge to hedge." Mr. Stroud said that when he ran over a survey stake with his lawn mow-

er, it confirmed what he already knew, that he "had bought from hedge to hedge." He said that the hedge was on Mr. Bollinger's property and that the survey stake was four inches "on my side of that hedge . . . ." Referring to the boundary line location, Stroud said that when he saw the stake, he thought "that that must be the exact point."

When asked what he intended to convey to the Sigmans, Stroud replied, "The house and from hedge to hedge, . . . ." He said that he did not intend to convey more than he actually owned. He said, " . . . I, myself, intended to sell them what was mine and I owned from hedge to hedge. This was what we knew that we had and this was what I intended to sell him." He testified that he intended to sell all that he knew he owned. He said that he knew he owned "from hedge to hedge." It is clear from the testimony of the Strouds that they only intended to sell that property which they thought they owned. The Strouds testified that they thought they owned the property as defined by the hedges on the north; they also testified that they thought they owned the property as defined by the surveyor's stakes on the north. The physical difference in the extent of the property as defined by the surveyor's stakes on the north and as defined by the hedges on the north is only four inches.

The Strouds and the Sigmans had little discussion about the sale of the house prior to the transfer of the deed. All significant negotiations for the parties were handled by the two real estate agents. The Strouds offered no testimony about any affirmative actions or statements by the Sigmans prior to the transfer of the deed to indicate the Sigmans' beliefs about the boundaries of the property at that time. However, the Strouds did present evidence of actions and statements by Mr. Sigman after the transfer of the deed that indicate that at the time the deed was transferred, Sigman knew that he was only purchasing property 80 feet wide.

As indicated above, approximately eight months after the transfer of the deed, Sigman and Bollinger had several discussions concerning the exact boundary line between their properties. Mr. Bollinger testified:

Well, it was about eight months after, approximately, and he got his tax statement. He told me and he come up and he wanted to know why he had 105 feet when he had only bought 80.

Mr. Bollinger said that three weeks later, Sigman asked him where the property line between the properties was located. Bollinger said that he told Sigman at that time "exactly where the stakes were." Two weeks after that, Bollinger said that Sigman wanted him to buy the 25 feet in question from Sigman for $2,000.

It is clear from Bollinger's testimony concerning the first conversation between Bollinger and Sigman about the boundary lines that up until that time, Sigman thought he had purchased property only 80 feet wide. The essence of Bollinger's testimony is that Sigman admitted to him that he thought the land he bought was only 80 feet wide.

Bollinger's testimony also indicates that Sigman only realized that Lot 69 as described in his deed was 105 feet wide instead of 80 feet wide after he received his first property tax statement several months after the sale. Because of the sale and re-purchase by Bollinger many years earlier of one-half of Lot 69, two tax bills had since been issued against Lot 69; each bill taxed 52½ feet, or one-half of Lot 69. Of course, the two bills together indicated that Lot 69 was 105 feet wide. The parties stipulated that the tax bill for 1971 issued against Lot 69, then owned by Sigman, was split in this manner. It appears that but for the issuance of the two tax bills, Sigman might well have never realized that Lot 69 included more property than the 80 feet within the hedges in his backyard.

Sigman's delay of eight months in asserting any interest in the northern 25 feet of Lot 69 is also a strong indication that at the time he purchased the property, he did not actually intend to purchase that 25 feet. If he did so intend, why did he wait eight months to assert his claim? Why for those eight months did he let Bollinger use that 25 feet as part of Bollinger's backyard? Without any evidence from the defendant rebutting Bollinger's above testimony, it is reasonable to conclude from that testimony that when Sigman entered the contract and accepted the deed he intended to buy property only 80 feet wide.

The encounter between Bollinger and Sigman occurred approximately in April, 1972. According to plaintiffs' exhibit 1 on May 2, 1972, Sigman called the Safety Federal Savings and Loan Association. The secretary with whom Sigman spoke wrote on a note pad at that time Sigman's reason for calling. The note paper, which plaintiffs offered in evidence, reads:

> Says he figures he has 80′ Front whereas survey shows 105 ft. Wants property staked & told him a survey Co. would have to do this.

■ The note indicates that at the time Sigman placed the phone call, he believed his property was 80 feet wide. Other than the legal description in the deed itself, there is no evidence to indicate that from the time Sigman accepted the deed until the time he placed the phone call Sigman believed his property was other than 80 feet wide. Because this is an action to reform the deed, the legal description in the deed is, of course, not conclusive. Therefore, the note reasonably indicates that at the time Sigman entered the sales contract and accepted the deed, he intended to purchase property 80 feet wide.

■ Because there is no conflict in any of the plaintiffs' testimony, this court need not defer to the trial court's findings on any issue of credibility. Mission Insurance Company v. Ward, 487 S.W.2d 449 (Mo. Banc 1972). In light of all the plaintiffs' evidence, the single piece of evidence supporting the defendants' contention that there was no mutual mistake, the legal description in the deed, is insufficient to justify the judgment for the defendant. The judgment of the trial court is clearly erroneous as to plaintiffs Stroud, and the cause is remanded as to the plaintiffs Stroud and affirmed as to the plaintiffs Bollinger.

All concur.