Merrimack
No. 2011-746

# THE SUNAPEE DIFFERENCE, LLC

v.

# THE STATE OF NEW HAMPSHIRE

Argued: September 13, 2012
Opinion Issued: April 30, 2013

*James E. Higgins PLLC*, of Manchester (*James E. Higgins* on the brief and orally), for the plaintiff.

*Michael A. Delaney*, attorney general (*Richard W. Head*, associate attorney general, on the brief and orally), for the State.

HICKS, J. The plaintiff, The Sunapee Difference, LLC, appeals: (1) an order of the Superior Court (*Nicolosi*, J.) granting summary judgment to the defendant, the State of New Hampshire, on Sunapee's claims for breach of contract, equitable estoppel, promissory estoppel, breach of an implied covenant of good faith and fair dealing, reformation, and inverse condemnation; and (2) an order of the Superior Court (*Mangones*, J.) partially

granting the State's motion to dismiss Sunapee's inverse condemnation claim. The State appeals an order of the Superior Court (*Brown*, J.) ruling that Sunapee has standing to bring its reformation claim. We affirm in part, reverse in part, vacate in part, and remand.

The following facts were assumed by the trial court in ruling on the State's motion for summary judgment, or are supported by the record. In 1996, the legislature authorized the New Hampshire Department of Resources and Economic Development (DRED) to draft an agreement to lease the ski area at Mount Sunapee State Park. RSA 12-A:29-a (2003). The next year, the legislature directed the commissioner of DRED, in consultation with a joint legislative committee, to develop a request for proposals (RFP) for, among other things, "a lease, concession agreement, or management contract" for the Mount Sunapee ski area. Laws 1997, ch. 119.

In October 1997, the State released a draft RFP, giving prospective operators, interested parties, and the public an opportunity to comment. Representatives from Sunapee's predecessor, Okemo Mountain Resort, Inc.,[1] attended both a public hearing on the RFP on November 12, 1997, and a mandatory informational meeting held a week later for operators considering submitting a proposal.

On January 15, 1998, the State issued the final RFP, requiring proposal submission by April 1, 1998. The RFP stated that "[i]f the Commissioner recommends the award of a lease, concession agreement or management contract resulting from this RFP, it shall not be final or binding upon the State unless and until it is approved by the Capital Budget Overview Committee and the Governor and Executive Council." Included with the RFP was a partial map of Mount Sunapee State Park showing the existing ski area. The property to be leased was depicted as a shaded area; the state park boundaries were not shown. Sunapee alleges that it understood, based upon representations by agents of the State, that the leased premises extended to the state park's northern and western boundaries.

Sunapee submitted its proposal, which the State accepted. DRED Commissioner Robb Thomson and Sunapee president Timothy Mueller negotiated a Lease and Operating Agreement (the Lease), which they signed on April 30, 1998. Senior Assistant Attorney General Michael Walls approved the Lease on May 4. Sunapee and Thomson had previously agreed in writing that the State, through DRED, would complete a metes and bounds survey of the leasehold premises. At the time of signing,

---

[1] At some point after the lease agreement at issue was executed, Okemo assigned all of its right, title, and interest therein to The Sunapee Difference. For ease of reference, we will treat Sunapee as having been the party in interest all along and use the name Sunapee in this opinion to refer to Okemo as well as The Sunapee Difference.

however, no legal description of the leasehold or map showing its metes and bounds had been provided to Sunapee or attached to the Lease.

The Capital Budget Overview Committee approved the Lease on May 14. Sometime after that date, but prior to June 10, the State produced a map and property description with the metes and bounds of the leasehold area. The leased premises as described in those documents did not extend to the northern and western boundaries of the state park, but rather left a buffer area between the park boundaries and leasehold boundaries. Those documents were appended to the Lease when Governor Jeanne Shaheen and the Executive Council approved it on June 10, 1998.

Sometime in 2000, Sunapee discovered that the northern and western leasehold boundaries described in the Lease were not coterminous with those of the state park. Sunapee's attorney, George Nostrand, contacted Attorney Walls, who agreed that an error had been made and suggested the lease be amended to correct it. Director of Parks Richard McLeod also acknowledged an error. Nevertheless, while Nostrand and Walls exchanged proposals for amending the Lease between January and April 2001, the Lease was never amended.

From the time it responded to the RFP, Sunapee had proposed expanding the ski area to the east. During the RFP pre-submittal stage, the State provided prospective operators with eastern expansion plans the State had itself developed but had never implemented. Sunapee's plans were thwarted, however, when old growth forest was discovered in the area of its proposed expansion. At that point, expanding to the west became the only viable option.

In 2000, Sunapee obtained options to buy privately-owned land bordering the western boundary of the state park. Because the leasehold and state park boundaries were not described as coterminous in the Lease, however, this land could not be used for expansion without including the buffer land in the leasehold. Accordingly, Sunapee requested that DRED approve inclusion of the buffer land in an amendment to the Lease.

On February 27, 2002, George Bald, who was then commissioner of DRED, announced that he would recommend such a lease amendment to the Governor and Executive Council only after Sunapee met three enumerated conditions. Around this time, Sunapee informed the State that its purchase options on land adjacent to the state park would soon expire. Based upon Bald's assurances that he still favored the western expansion plan as long as Sunapee satisfied his enumerated conditions, Sunapee exercised the purchase options for $2.1 million.

Although Sunapee met Bald's conditions, the expansion plan was not presented to the Governor and Council while Bald was commissioner and

while Craig Benson was Governor. In 2004, Sean O'Kane became commissioner of DRED. He imposed additional conditions, which Sunapee also met.

John Lynch became Governor in 2005. While campaigning, he strongly opposed Sunapee's plan for expansion. Once in office, Governor Lynch urged Commissioner O'Kane to reject the plan, but O'Kane nevertheless recommended that the State conditionally approve a lease amendment expanding the leasehold. Governor Lynch, however, refused to bring the amendment before the Executive Council.

In October 2007, Sunapee sued the State for damages or, alternatively, mandamus relief, alleging breach of contract, estoppel, breach of an implied covenant of good faith and fair dealing, and inverse condemnation. The State moved to dismiss, which the trial court denied except as to the mandamus claim and so much of the inverse condemnation claim as concerned "land outside the boundaries of [Sunapee's] original lease." The mandamus claim was dismissed without prejudice and Sunapee was given leave to amend its bill of complaint to add a claim for reformation of contract. Sunapee filed its amended bill of complaint, adding a reformation count, in December 2008.

The State moved to strike the reformation claim on the ground that Sunapee had assigned all of its right, title and interest in the Lease to CNL Income Mount Sunapee, LLC (CNL), and, therefore, lacked standing to bring a reformation claim. The State also moved for summary judgment on all claims. The trial court granted that motion, assuming, without deciding, that Sunapee had standing to seek reformation of the Lease. Sunapee appealed.

In its response in that appeal, the State again asserted that Sunapee lacked standing to seek reformation of the Lease. Because standing is jurisdictional, we declined to proceed with the appeal without a finding on the issue. Furthermore, because standing is a question of fact and the record was insufficient for us to determine the issue as a matter of law, we remanded for a factual finding by the trial court. Although the State challenged standing only with respect to the reformation claim, we remanded for a determination of standing as to all counts, while otherwise retaining jurisdiction of the appeal.

On remand, the trial court ruled that: (1) a release of claims against the State contained in the assignment to CNL (the Release) did not apply to Sunapee and therefore did not bar any of its claims; and (2) Sunapee retained the right to assert its reformation claim. The State filed an appeal, which we accepted. Accordingly, the standing issue and all issues decided by summary judgment are currently before us.

*I. Standing*

We begin with the issue of standing. As Sunapee notes, the State has appealed only the trial court's finding that Sunapee has standing to seek reformation of the lease, and thus has conceded that Sunapee has standing as to its other claims. We therefore consider Sunapee's standing with respect to the reformation claim only.

On appeal, the State concedes that the Release language applies only to CNL and not to Sunapee. Nevertheless, it argues that the trial court erred in finding that Sunapee has standing to pursue the reformation claim because: (1) Sunapee, having "assigned all of its right, title, and interest in the Lease to CNL[,] . . . is no longer a party to the Lease, and . . . [therefore] lacks standing to seek its material reformation"; and (2) CNL, having acquired any claim for reformation that Sunapee may have had, released those claims.

■ "In evaluating whether a party has standing to sue, we focus on whether the party suffered a legal injury against which the law was designed to protect." *Libertarian Party of N.H. v. Sec'y of State*, 158 N.H. 194, 195 (2008) (quotation omitted). We will uphold the trial court's ruling on a jurisdictional challenge based upon a lack of standing unless that decision is not supported by the evidence or is legally erroneous. *Birch Broad. v. Capitol Broad. Corp.*, 161 N.H. 192, 199 (2010).

The State's first argument appears to rest on the "general rule that a non-party to a contract has no remedy for breach of the contract," *Arlington Trust Co. v. Estate of Wood*, 123 N.H. 765, 767 (1983), and, by analogy to that rule, no right to reform the contract. Thus, the State first asserts that following the assignment to CNL, "Sunapee Difference [was] no longer a party to the Lease." *See Tulley v. Sheldon*, 159 N.H. 269, 272 (2009) (noting that a lease is a form of contract). Sunapee counters that "[t]he assignment did not completely terminate [its] privity with the State," and asserts that it still stood in privity of contract. *Cf. Robo Sales, Inc. v. McIntosh*, 495 S.W.2d 420, 423 (Mo. 1973) (noting that court of equity will reform a lease as between original parties and those in privity). We pause, then, to consider the nature of the relationship between the parties to a lease, and the effect of an assignment on that relationship.

■ "Between the lessor and the lessee there is both privity of contract and privity of estate, so long as the lessee retains the term." *The Trustees of Dartmouth College v. N. Clough*, 8 N.H. 22, 28 (1835). "A grant by the lessee of his entire interest constitutes an assignment." *Machinist v. Koorkanian*, 82 N.H. 249, 252 (1926). Such an assignment terminates the privity of estate between lessor and lessee, but "there still remains the

privity of contract between them, created by the lease, which is not affected by the assignment. The lessee still continues liable on his covenant [to pay rent] by virtue of the privity of contract." *La Société v. Owen*, 79 N.H. 318, 319 (1919) (quotation omitted). This is true even where the lessor assents to the assignment. *Id.* The assignor "remain[s] liable for the rent in the absence of novation, substitution or release." *Machinist*, 82 N.H. at 253.

As the foregoing makes clear, Sunapee is correct in claiming continued privity of contract with the State. This does not, however, afford Sunapee standing to reform the lease with respect to the description of the leasehold property. While Sunapee, through privity of contract, remains liable on its covenant to pay rent, "that liability will remain unchanged and unaffected by any decree that can be made upon this bill [in equity], which is brought to reform the instrument in a particular in no way connected with the amount of the rent, or the times and mode of its payment." *Cole v. Lake Company*, 54 N.H. 242, 272 (1874) (finding assignors were not necessary parties in an action to reform a lease).

Nevertheless, the trial court found that "[i]n assigning the lease to CNL, Sunapee specifically reserved its rights in the litigation against the State." In other words, notwithstanding what otherwise may have been the legal consequence in the absence of an indication of contrary intent, *cf. National Reserve Co. v. Metropolitan Trust Co.*, 112 P.2d 598, 602 (Cal. 1941) (Given "[a]n unqualified assignment . . . with no indication of the intent of the parties, . . . the assignment of a contract passes from assignor to assignee an accrued cause of action for . . . reformation."), the parties here contracted to keep the right of action in Sunapee.

■ We have held:

> [T]he meaning of a contract is ultimately a matter of law for this court to decide. In reviewing a contract, we will give its language the interpretation that best reflects the parties' intentions. In interpreting a contract, we will consider the situation of the parties at the time of their agreement and the object that was intended thereby, together with all the provisions of their agreement taken as a whole.

*Butler v. Walker Power*, 137 N.H. 432, 435 (1993) (quotations and citation omitted).

The assignment here does not explicitly state that Sunapee retains the right to sue for reformation. It first provides that Sunapee assigns to CNL "all of [Sunapee's] right, title and interest in, to and under the Lease Agreement, subject to the terms and conditions of the Lease Agreement." It then references the ongoing litigation between Sunapee and the State in

an estoppel provision, in which Sunapee and the State (joining in the assignment for this purpose) represent and warrant to CNL that "[a]s of the date of this Assignment: . . . (iii) there are no existing claims, defenses or offsets against obligations of either [the State] or [Sunapee] under the Lease Agreement, . . . (excepting therefrom the claim by [Sunapee] with respect to the leasehold boundary)." Finally, it contains a release that, in its final form, mentioned the reformation claim explicitly:

> 1.5 *Release by Assignee [CNL]*. Assignee releases and forever discharges [the State] from any and all claims, demands, benefits, damages, relief, judgments, or the like relating to or resulting from claims of [Sunapee] against the [State] relating to the subject matter of the lawsuit known as The Sunapee Difference, LLC v. State of New Hampshire, Merrimack County Superior Court Docket No. 07-E-458, including any potential claim that could have or may be brought by [Sunapee] relating to reformation of the leasehold boundary; provided, however, Assignee retains all rights with respect to other matters not currently known or existing.

The trial court found that "[t]he effect of [this] language clearly refers only to CNL releasing its right to pursue the underlying matter" and, as noted above, the State now concedes as much. The trial court also found telling Sunapee's absence from the release provision, as do we. The court found that the State acknowledged Sunapee's reservation of the claim when the State "required the release from the assignee, CNL, without reference to Sunapee's interest."

Consideration of "the situation of the parties at the time of their agreement and the object that was intended thereby," *Butler*, 137 N.H. at 435 (quotations omitted), further supports the trial court's conclusion. In seeking the State's approval of the assignment, Sunapee described the transaction as "a sale and leaseback[,] . . . a form of financing" that Nostrand testified at his deposition was common in the ski industry. Sunapee stated that the contemplated transaction would involve an assignment of the Lease to CNL and sublease of the premises back to Sunapee.

The asset purchase agreement between Sunapee and CNL specifically excluded from the assets conveyed to CNL "[a]ny monetary judgment in favor of Sunapee arising out of the Sunapee Lease Litigation," thus clearly evincing the intent between Sunapee and CNL to leave the chose in action with Sunapee. The State notes, however, that it was never provided a copy of the asset purchase agreement and was assured by Nostrand, after all reference to that document was deleted from the assignment, that the purchase agreement was "not an important part of the [a]ssignment." We

need not rely upon the asset purchase agreement, however, to determine that the record contains ample support for the trial court's ruling on the standing issue.

On October 29, 2008, during the course of negotiations over the assignment, the State requested information from Sunapee, including "[a] written explanation regarding what the Sunapee Difference is proposing to assign to CNL." Specifically, in that letter, Associate Attorney General Anne Edwards referenced Sunapee's ongoing "litigation against the State over the leasehold boundary and issues of expansion" and inquired as to "[e]xactly what . . . the Sunapee Difference [was] planning to assign and/or do with the pending lawsuit." Edwards wrote that "[u]ltimately, the State can only agree to an assignment of the lease approved by the Governor and Executive Council on June 10, 1998."

Nostrand replied that the "[a]ssignment only affects the existing described leasehold and is not intended to deal with any of the issues addressed in the pending lawsuit. All parties are aware that there is presently nothing additionally to assign." At the time, Sunapee had not yet moved to add a claim for reformation, but neither had its mandamus claim been dismissed. Accordingly, Edwards knew at the time that reformation "was a potential claim that was out there" because "the request for mandamus was essentially a request for reformation."

On December 2, 2008, Senior Assistant Attorney General Anthony Blenkinsop proposed release language that included claims for reformation of the lease. Edwards testified at her deposition that "[t]he intent in offering this language was to make sure that CNL waived any claims and any potential claims to make sure that Sunapee Difference had no ability to bring a reformation claim against the State." Nevertheless, the State did not require Sunapee to join the release and Edwards admitted that the State "knew that Sunapee would not be willing to openly waive its lawsuit." We conclude that the record demonstrates that the State knew Sunapee intended to retain its reformation claim against the State, and that the State acquiesced thereto.

This conclusion does not end our inquiry, however. Having determined that the parties intended and agreed to keep the reformation claim in Sunapee's hands, we must now determine whether the law will countenance that agreement and recognize Sunapee as the real party in interest. *Cf. Connecticut v. Physicians Health Services of CT*, 287 F.3d 110, 118 (2d Cir. 2002) (finding that State, as assignee of plan participants' rights to bring equitable actions under ERISA, did not have standing where State did not have requisite injury and "[e]ven if the assignments are valid as a contractual matter, they . . . merely give the State the right to act as a nominal party").

■ As noted above, ordinarily a lessee/assignor retains no interest in the lease with respect to the property interest conveyed, even though it remains liable under its covenant to pay rent. *See Cole*, 54 N.H. at 272. Thus, when a lessee "assigns all of its rights, title and interest under a lease, it cannot assert standing in an action predicated upon a breach of that lease." *Staples, Inc. v. W.J.R. Associates*, No. 04 CV 904 (SJ) (KAM), 2007 WL 1039535, at *2 (E.D.N.Y. Mar. 30, 2007) (discussing New York law). The United States District Court, in *Staples*, explained the rule as follows: "The underlying logic of this black letter law is simple: once a lessee has relinquished his interest and obligations in the leased premises, there is no practical way he can be harmed by a subsequent breach." *Id.* Similarly, once a lessee breaks the privity of estate by assigning the lease, any remedy that would affect the property interest under the lease would ordinarily inure to the benefit of the assignee, not the assignor. The situation is loosely analogous to that in *Physicians Health Services*, in which the State of Connecticut was held to lack standing despite having contractually acquired from plan participants the right to bring certain equitable actions under ERISA. *Physicians Health Servs.*, 287 F.3d at 112. Although the contracts gave the State the nominal right to sue, they did not "confer 'actual' rights or benefits under ERISA on the State." *Id.* at 115. The court held that the State "fail[ed] to meet the injury requirement because it does not have a concrete private interest in the outcome of the suit." *Id.* at 118 (quotation omitted). "Through the assignments, the State has acquired only the right to control the equitable portion of a lawsuit seeking redress of the assignor-participants' rights under ERISA. None of the remedies being sought would flow to the State as assignee." *Id.*

■ We need not decide whether a party that holds a contractual right to bring an equitable claim but does not stand to benefit from the remedy would have standing to sue. Here, Sunapee has a concrete interest in the outcome of the reformation action. As the sublessee of CNL, Sunapee remains in possession of the leasehold property. The sublease, which was provided to the State for review, provides that "[a]ny additional property that is hereafter added to or incorporated into the [Lease] shall be automatically and immediately added to and encompassed in the definition of Land upon the amendment or modification of such [Lease]." The sublease also granted Sunapee a right of first offer, under which, as described by Nostrand, "if CNL decides to individually sell Mt. Sunapee's lease/operations they would first offer it to [Sunapee] for a specific price." We conclude that Sunapee contractually retained a sufficient interest in the outcome of the reformation claim to grant it standing to sue. *Cf. Birch Broad.*, 161 N.H. at 200 (assignor had standing despite assigning rights

under contract to acquire radio station from defendants where defendants' refusal to close transaction harmed assignor by denying it benefits retained in assignment agreement, including right to repurchase radio station from assignee under certain circumstances). Accordingly, we affirm the trial court on this issue.

## II. Sunapee's Claims for Relief

We now turn to the claims disposed of on summary judgment.

> In reviewing a grant of summary judgment, we look at the affidavits and other evidence, and all inferences properly drawn therefrom, in the light most favorable to the non-moving party. If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment.

*Del Norte, Inc. v. Provencher*, 142 N.H. 535, 537 (1997) (quotation, citation, and brackets omitted). "We review the trial court's application of the law to the facts *de novo.*" *Hopkins v. Fleet Bank - NH*, 143 N.H. 385, 388 (1999).

### A. Breach of Contract

Sunapee's breach of contract claim alleges that the State, through the Governor and Council, had a contractual duty under the Lease "to hear and vote on a proposal for a Lease Amendment" and "to approve some form of expansion outside of the present leasehold boundary." The State breached that duty, Sunapee alleges, "(A) by continually refusing to fulfill its promise to hear proposals for amendments to the [Lease], (B) by refusing to consider expansion when expansion had been promised to Sunapee, and (C) by refusing to correct the leasehold description to coincide with the Park's Northern and Western boundaries." The trial court rejected each claimed breach.

Sunapee first contends that the trial court erred in failing to find the Lease ambiguous as to: (1) "whether the Governor alone can approve/deny an amendment, or whether he is required to present the amendment to the Executive Council for a combined vote"; and (2) "expansion rights."

■ "A lease is a form of contract that is construed in accordance with the standard rules of contract interpretation." *N.A.P.P. Realty Trust v. CC Enterprises*, 147 N.H. 137, 139 (2001) (quotation omitted). "The interpretation of a contract, including whether a contract term is ambiguous, is ultimately a matter of law for this court to decide. A clause is ambiguous when the contracting parties reasonably differ as to its meaning." *Hopkins*, 143 N.H. at 388 (quotation and citation omitted).

The first Lease provision that Sunapee claims is ambiguous is contained in paragraph 27, which provides: "This Agreement may be amended, waived or discharged only by an instrument in writing signed by the parties hereto and only after approval of such amendment, waiver or discharge by the Governor *and* Executive Council of the State of New Hampshire." (Emphasis added.) Sunapee contends that the term " '[a]nd' commonly means 'along with or together with.' " It therefore reads paragraph 27 to require the Governor to submit its expansion plans to the Council for approval. The State, on the other hand, contends that the language does not compel the Governor to present the Executive Council with a proposed amendment that he opposes and for which "his approval is necessary." The trial court adopted the State's view, ruling that "the use of the conjunction 'and' to a layperson would mean that the consent of the Governor is required independently of that of the Executive Council."

 We disagree with the trial court and conclude that the parties reasonably differ as to the meaning of paragraph 27. It could be read, as Sunapee contends, to require submission of a proposed amendment to the Council so that the Governor could act with that body's advice. It could also be read, as the State contends, to require, in any event, the approval of both the Governor and the Council, so that rejection by the Governor would make submission to the Council a futile exercise. Accordingly, we find paragraph 27 to be ambiguous.

> If [an] agreement's language is ambiguous, it must be determined, under an objective standard, what the parties, as reasonable people, mutually understood the ambiguous language to mean. In applying this standard, a court should examine the contract as a whole, the circumstances surrounding execution and the object intended by the agreement, while keeping in mind the goal of giving effect to the intentions of the parties.

*Birch Broad.*, 161 N.H. at 196-97 (citation omitted). While the process of applying this standard "necessarily involves factual findings," *N.A.P.P. Realty Trust*, 147 N.H. at 141, and, thus, "[a]n argument between the parties about the meaning of an ambiguous contractual term is typically an argument about a material fact," *Hopkins*, 143 N.H. at 389-90 (quotation omitted), here, we are able to resolve the ambiguity as a matter of law.

Paragraph 27 sets forth the method by which the lease may, among other things, be amended. We presume that the parties, as reasonable people, intended this method to be one that would validly effectuate an amendment under the law. We therefore also presume that the parties intended the provision to comply with RSA 4:40 (Supp. 2012), the statute relating to disposal of state-owned real estate. That statute provides that "all requests

for the disposal or leasing of state-owned properties shall be . . . [submitted] to the governor and council for approval." RSA 4:40, I. We conclude that the language "approval of such amendment . . . by the Governor and Executive Council" in the Lease was intended by the parties to refer to approval by the Governor and Council according to RSA 4:40. Thus, we further conclude that the parties intended the phrase "Governor and Executive Council" in the Lease to mean the same thing as the phrase "governor and council" in the statute.

▮ RSA 21:31-a (2012) defines "[t]he phrase 'governor and council' . . . [to] mean the governor with the advice and consent of the council." The Supreme Judicial Court of Massachusetts has interpreted a phrase equivalent to "with the advice and consent of the council" as follows:

> As to th[e] class of cases, where the Constitution declares that the power to act is in the Governor, or that the act may be done by the Governor, "by and with the advice of council," or "by and with the advice and consent of the council," we are of opinion that the responsibility rests primarily upon the Governor to determine as the supreme executive magistrate whether any action is called for, and what action, if any, is desirable; and that the provision for advice of the council is a requirement that their approval and concurrence shall accompany the affirmative act and enter into it before it becomes complete and effective. . . . [Accordingly], the natural course of proceeding would seem to be that [the Governor] should seek such aid as he might desire from any proper source, and not be obliged to ask advice, in the first instance, from an official body whose opinion could never relieve him from the duty of deciding.

*In re Opinion of the Justices*, 78 N.E. 311, 312 (Mass. 1906). Our case law is in accord. *See Brouillard v. Governor and Council*, 114 N.H. 541, 547 (1974) (where statute called for appointment of official by governor and council, "[i]n accordance with RSA 21:31-a the sole power of appointment lies with the Governor subject to the consent of the council" (quotation omitted)); *cf. Opinion of the Justices*, 340 A.2d 25, 30 (Me. 1975) (noting that under statute calling for appointment of official by the Governor with the advice and consent of Council, Governor and Council act independently, the Governor "may or may not seek the advice of the Council," and "it is no part of the duties of the Council to attempt to dictate the nomination or to originate the action").

▮ Guided by the foregoing principles, we conclude that RSA 4:40 would not require the Governor to put before the Executive Council a proposed

lease of state lands that the Governor does not approve. Addressing a similar issue, namely, whether the Governor was required to submit a petition to pardon a convicted criminal to the Council, where the Massachusetts Constitution rests the power of pardoning "in the Governor, by and with the advice of council," *In re Opinion of the Justices*, 78 N.E. at 311, the Massachusetts high court opined that the Governor was not "obliged to bring before the council an application for pardon when he was plainly of opinion that no pardon should be granted. Nothing could ever be gained by asking the council to give advice under such conditions." *In re Opinion of the Justices*, 78 N.E. at 312. Similarly, here, RSA 4:40 did not require the Governor to present the proposed lease amendment to the Executive Council when he did not approve the amendment himself. Thus, because we interpret paragraph 27 to conform to RSA 4:40, paragraph 27 also did not require Governor Lynch to present the proposed lease amendment to the Executive Council. We affirm the trial court on this issue.

Sunapee also asserts ambiguity regarding the right to expand. Sunapee argues that "[a] right to expand is necessarily implied in the lease." While that implied right does "not guarantee a particular form of expansion," Sunapee asserts that it does "guarantee that all expansion could not be denied."

In rejecting Sunapee's argument, the trial court "recognize[d] that there is substantial evidentiary support for a conclusion that all parties at the time the Lease was executed contemplated and even desired the future expansion of the ski area." It concluded, however, that "no 'right' to expand or 'guarantee' of expansion of the ski area can be found in the [Lease's] language." We, too, find no such right or guarantee, either express or implied, in the Lease. Accordingly, we affirm the trial court on this point.

Sunapee further contends that the State breached the Lease by "fail[ing] to draw the leasehold boundary lines as promised." We agree with the trial court that this argument is more properly addressed in connection with Sunapee's reformation claim, and, therefore, affirm the trial court's ruling on the breach of contract claim.

## B. *Estoppel*

■ ■ Sunapee next argues that the trial court erred in granting summary judgment in favor of the State on Sunapee's estoppel claims. The parties appear to agree that only claims of equitable estoppel are before us. A party making such a claim must prove four elements:

> first, a representation or concealment of material facts made with knowledge of those facts; second, the party to whom the representation was made must have been ignorant of the truth of the

matter; third, the representation must have been made with the intention of inducing the other party to rely upon it; and fourth, the other party must have been induced to rely upon the representation to his or her injury.

*A.J. Cameron Sod Farms v. Continental Ins. Co.*, 142 N.H. 275, 281 (1997) (quotation omitted). With respect to the last element, the reliance of the party claiming estoppel must have been reasonable. *City of Concord v. Tompkins*, 124 N.H. 463, 468 (1984).

Sunapee advances two estoppel claims based upon separate representations by the State: that Sunapee would be permitted to expand the leasehold area and that the leasehold's northern and western boundaries would be coterminous with those of the state park. We examine each claim in turn.

The trial court found that the first claim, relating to expansion of the leasehold area, was contradicted by the Lease's plain language. In response, Sunapee reprises its argument that the Lease's language is ambiguous and, "in light of the extrinsic evidence, grants [it] a right to expansion." Having concluded above that the Lease contains no express or implied right or guarantee of expansion, we need not consider this claim further.

With respect to Sunapee's second claim of estoppel, relating to the leasehold's northern and western boundaries, the trial court found that it failed with respect to two of the required elements: false representation or concealment of a material fact and reasonable reliance. The court first found "inadequate support for a finding that Commissioner Thomson or other State official *knowingly* made a false representation or concealed a material fact." We disagree with the trial court's determination, and conclude that Sunapee has raised a genuine issue of material fact.

The record establishes that on January 15, 1998, DRED issued the RFP, which included a map of the leased premises dated October 1997. The map was prepared at the direction of Thomson, who instructed that "the leasehold area [be defined] as closely to the existing ski area and ski trails. Only what was necessary for the existing operation of that ski area and no more." Thus, at his deposition, Thomson answered affirmatively to the question of whether he "knew that the area that [the State was] offering for lease did not come up to the edge of the park boundary on the north and west."

Sunapee's general manager, Donald MacAskill, testified at his deposition that at a site visit in 1997 or early 1998, "the way the leased portion of the land was presented[] [was such] that any interested parties that would submit a proposal would be leasing the entire ski resort, as well as those

lands adjacent to and around the perimeter of the ski trail and lift network." Thus, "it was [Sunapee's] understanding that lands to the north and to the west, that the leased portion of the ski area would be — those lands could be coterminous or, I should say, the boundary of the RFP would be coterminous with the state-park boundary." As previously noted, the map provided in the RFP is shaded to depict the area leased, but does not show the boundaries of the state park. Thus, as Commissioner Thomson acknowledged in his deposition testimony, one cannot tell from the map where the park boundary is in relation to the shaded area.

MacAskill testified at his deposition that between the time the RFP was issued and Sunapee submitted its proposal, he spoke to Thomson three or four times and was told "that the leasehold would include the land around the perimeter of the lifts and trail network. And, specifically on the north and west side, would be coterminous with the state-park boundary." Mueller testified that at one or two meetings he had with Thomson prior to execution of the Lease, Thomson also told him that the leasehold boundary would be coterminous with the state park boundary on the north and west. Thomson denied making that statement to Mueller, but, when asked if he could "remember saying anything to Mr. Mueller about the park boundary and its relationship to the leasehold area," he stated that he did not recall. In addition, despite admitting that he knew the boundaries were not coterminous, Thomson could not recall ever telling that to any of the people who responded to the RFP. Similarly, when asked if he ever told any of those people "that there was a buffer zone being preserved between the park boundary on the north and west side and the area [the State was] leasing," Thomson responded "No." We conclude, therefore, that Sunapee raised a genuine issue of material fact as to whether Thomson knowingly made a false representation or concealed a material fact relating to the leasehold's northern and western boundaries.

The trial court also found, however, that "[e]ven if Sunapee could show that a State official knowingly made a false representation or concealed a material fact, [it] cannot show it was reasonable in relying on any such representation." It reasoned that, because both the RFP and the Lease stated that the Governor and Council must approve the Lease and any amendment thereto, "Sunapee knew that neither DRED nor the Attorney General had the authority to bind the State by promises made during the lease negotiations or by a promise to enter into an amendment to increase the leasehold after the lease had been approved."

Under New Hampshire law, the State is not estopped by an unauthorized statement of its official. *Turco v. Town of Barnstead*, 136 N.H. 256, 262 (1992); *City of Concord*, 124 N.H. at 468. "We have long recognized

that all private parties dealing with government officials are charged with notice of the extent and limits of their authority." *City of Concord*, 124 N.H. at 470 (quotation omitted). "Governmental estoppel is appropriate," however, "when government officials are acting within their prescribed sphere and functions, and are exerting no excess of authority." *Id.* at 468 (quotations, citation, and brackets omitted). Accordingly, we examine the authority of the State officials in this case.

Laws 1997, chapter 119 directed that the commissioner of DRED "shall, in consultation with the committee established in section 2 of th[at] act, develop and issue a request for proposals to include but not be limited to a lease, concession agreement, or management contract for the Mount Sunapee . . . ski area operation[ ]." Laws 1997, 119:1, I. Thus, Thomson was authorized to develop the RFP, which we interpret to include the authority to define the leasehold. Thomson testified at his deposition that he directed the preparation of the map appended to the RFP and instructed how it should be drawn "to define the leasehold area." That later approval of the Lease by the Governor and Council was required does not affect our conclusion that at the time Thomson allegedly made representations to Sunapee about the leasehold boundary, it was within his authority to do so.

We must determine, nevertheless, whether the requirement of Governor and Council approval still precludes, as a matter of law, the availability of estoppel in this case. The State asserts that pursuant to RSA 4:40, only the Governor and Council are authorized to lease state lands. Accordingly, the State argues, Sunapee "was bound to understand that the Commissioner of DRED could not promise or agree to the ultimate leasehold boundary."

■■■ In *City of Concord*, we noted a "changing attitude toward the application of governmental estoppel" expressed in decisions from other jurisdictions. *City of Concord*, 124 N.H. at 471. Thus, we cited the observation by one court that "some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement." *Id.* at 472 (quotation omitted). We also cited cases from other jurisdictions holding "that a finding of affirmative misconduct on the part of a government official" can support a claim for governmental estoppel. *Id.* (quotation omitted). "In considering the imposition of estoppel against the government, courts have employed an equity balancing test, weighing the public interest in preventing the government from capriciously dealing with its citizens, against the risk, posed by estoppel, of undermining important governmental interests." *Id.*

Here, Sunapee has alleged the kind of capricious dealing or affirmative misconduct we discussed in *City of Concord*. Thus, we conclude that, upon

the record before us, the balance of equities weighs against a strict application of our governmental estoppel rules. *Cf. id.* at 473 (finding it unnecessary to depart, in that case, from existing New Hampshire case law). We note, however, that we signal no general departure from our case law on governmental estoppel and limit our holding on this issue to the facts of this case.

We must now determine whether Sunapee has raised any genuine issue of material fact regarding its allegations of official misconduct or capricious dealing that would require reversal of the trial court's grant of summary judgment on this issue. We conclude that it has. In addition to the issue of whether Thomson affirmatively represented to Sunapee that the boundaries of the leasehold and the state park were coterminous, we conclude that Sunapee has raised a genuine issue of material fact as to whether Thomson knowingly delayed providing Sunapee with a map showing the true boundary of the leasehold or a metes and bounds description of the same prior to Sunapee's execution of the Lease. When asked in his deposition whether, "[p]rior to signing [the Lease], . . . [he] contact[ed] anyone from the State to express any concerns or thoughts about there not being any documents attached to it," Mueller testified that he did, and that "[i]t was explained that they would come after." Sunapee argues that "[t]here is evidence that Commissioner Thomson knowingly delayed the production of a map and legal description until well after the lease was signed" by Sunapee. It notes that Thomson's deposition testimony that a surveyed map could not have been produced and provided with the RFP because of "[t]he time involved and it's rather difficult to get on the ground during the snow season" is contradicted by the testimony of Ronald Duddy, a surveyor/mapper with DRED, who produced the surveyed map and legal description. Duddy's deposition testimony indicates that he did not receive the instruction to produce the map until the beginning of May 1998, after Sunapee signed the lease. When asked whether there was "any reason [he] couldn't have done it in October as opposed to May," Duddy responded, "No." We conclude that Sunapee has raised a genuine issue of material fact requiring us to reverse the grant of summary judgment on this claim. We note that the trial court addressed reliance only with respect to Thomson's authority and we express no opinion as to the reasonableness of Sunapee's reliance in any other respect.

## C. *Breach of Implied Covenant of Good Faith and Fair Dealing*

Sunapee alleges that the State, through the Governor's refusal to submit its expansion proposal to the Executive Council and "to approve some form" of expansion, exceeded the limits on its discretionary power under the Lease imposed by the implied covenant of good faith and fair

dealing. *See Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 143-44 (1989) (discussing implied covenant of good faith and fair dealing). The trial court concluded that this claim failed as a matter of law. It noted that "implied covenants are qualified and restrained by any express covenants of a more limited character," *Great Lakes Aircraft Co. v. City of Claremont*, 135 N.H. 270, 284 (1992) (quotation omitted), and concluded that the Governor's authority under the Lease comported with his power under RSA 4:40 to reject any proposed lease amendment. We agree. Having concluded that paragraph 27 allowed the Governor to decline to submit the proposed amendment to the Executive Council, we will not recognize an implied covenant inconsistent with that authority. *See Great Lakes*, 135 N.H. at 284. Accordingly, we affirm the trial court on this issue.

### D. *Reformation*

Sunapee's reformation claim alleges that State officials represented to it that the leasehold's northern and western boundaries would be coterminous with the state park boundaries and promised to later provide a boundary map and written description. According to Sunapee, when the State produced the description after Sunapee executed the Lease, it did not match what had been represented and agreed upon. Sunapee alleges that representatives of the State promised to correct the error but have not done so.

"The plaintiff's burden of proof in a reformation action is a heavy one." *Sommers v. Sommers*, 143 N.H. 686, 690 (1999) (quotation omitted).

> Reformation of an instrument for mutual mistake of fact requires that the party seeking reformation demonstrate by clear and convincing evidence that (1) there was an actual agreement between the parties, (2) there was an agreement to put the agreement in writing, and (3) there is a variance between the prior agreement and the writing.

*Id.* at 689-90 (quotation omitted). Although parol evidence generally may not be considered to vary or contradict a written agreement, "it may establish that the writing itself does not reflect the actual agreement reached by the parties." *Id.* at 690.

The trial court granted summary judgment to the State on this claim because it found that "Sunapee cannot show by clear and convincing evidence that the parties had an actual agreement" that the leasehold and state park boundaries would be coterminous on the northern and western sides. The court found that even if Sunapee could show an agreement between itself and DRED, there is no evidence in the record that the

Governor and Council understood the boundaries to be coterminous. Rather, in fact, as the court noted, the written agreement presented to the Governor and Council contained the narrowly-drawn boundary.

Sunapee counters that the Governor and Council were not the negotiators of the Lease. Rather, it alleges that Thomson was the authorized negotiator, that he signed the Lease on behalf of the State, as he was authorized to do, and that he "was obviously authorized to bind the state to promises he made concerning the leasehold boundary." Thus, Sunapee's reformation claim may be read to assert that the parties reached an agreement as to the leasehold boundary, that the agreement was to be reduced to writing in the form of a map and legal description to be appended to the Lease, and that the map and description later appended and provided to the Governor and Council for approval did not reflect the parties' original agreement.

That the Governor and Council were given the more tightly-drawn leasehold description, and therefore presumably did not share the alleged misapprehension over the boundary at the time they approved the Lease, does not preclude Sunapee's reformation claim. Sunapee bases its reformation claim on the alleged misrepresentation by then DRED Commissioner Thomson that "the leasehold boundary on the north and west would be the State Park boundary," despite which, "[t]he boundary was purposefully drawn more tightly." Thus, Sunapee effectively asserts fraud by the State's agent, obviating the need to prove a mutual mistake of fact. *Cf. A.J. Cameron Sod Farms*, 142 N.H. at 283 ("Absent fraud, reformation requires a mutual mistake of fact."); *Larchmont Properties v. Cooperman*, 80 S.E.2d 733, 738 (Va. 1954) (noting that "the right to have reformation is not limited solely to cases of [mutual] mistake" but "may be granted where there is mistake on the part of one party and misrepresentation and fraud perpetrated by the other party to the hurt and detriment of the former"). As such, Sunapee's reformation claim closely resembles its estoppel claim, and, for the same reasons we held that summary judgment was improperly granted with respect to the estoppel claim, we reverse the grant of summary judgment on Sunapee's reformation claim. *Cf. Darner Motor Sales v. Universal Underwriters*, 682 P.2d 388, 401 (Ariz. 1984) (noting that "[t]he same disputed material facts which demand trial on the merits regarding the estoppel remedy can also be marshalled under the reformation theory").

### E. *Inverse Condemnation*

Sunapee asserts inverse condemnation, alleging that the right to expand that was promised to it "is an important and vital part of [its] property interest in the leased premises" and that the right has been taken by the

State, without compensation, "through the actions of the Governor in refusing to" present Sunapee's expansion proposal to the Executive Council. *See* N.H. CONST. pt. I, art. 12; U.S. CONST. amends. V, XIV. The Trial Court (*Nicolosi*, J.) granted the State's motion for summary judgment on this issue, ruling that because Sunapee lacks a property right to use land outside the leasehold boundary as presently written, no property right was taken. The court premised its ruling, in part, upon the "[a]bsen[ce of] a successful claim for reformation." Because we have reversed the grant of summary judgment on the reformation claim, we accordingly vacate the court's ruling on this issue.

The Trial Court (*Mangones*, J.) had previously dismissed so much of Sunapee's inverse condemnation claim as concerned "land outside the boundaries of [Sunapee's] original lease." This portion of the court's order does not make completely clear: (1) whether the land to which it refers is the land Sunapee owns outside the State Park boundary or the buffer zone within the State Park boundary; or (2) the basis upon which it differentiates that land from the land on which it allowed Sunapee's inverse condemnation claim to go forward. Accordingly, we vacate the partial dismissal of Sunapee's inverse condemnation claim and remand for consideration of its entire inverse condemnation claim in light of this opinion.

We note, however, that it is by no means clear that, upon these facts, an inverse condemnation claim can be brought as an alternative to a breach of contract claim. We have never addressed the issue, but courts in other jurisdictions have analyzed analogous claims under varying theories. *See, e.g., Barlow & Haun, Inc. v. United States*, 87 Fed. Cl. 428, 438 (2009) ("Ordinarily, the Government's interference with contractual rights arising under a contract with the Government will give rise to a breach of contract action, rather than a taking claim."); *Tamerlane, Ltd. v. United States*, 80 Fed. Cl. 724, 738 (2008) (noting that "when a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in contract, not taking"), *aff'd*, 550 F.3d 1135 (Fed. Cir. 2008); *Carl v. State*, 665 S.E.2d 787, 796, 797 (N.C. Ct. App. 2008) (ruling that because a claim under North Carolina Constitution "is available only in the absence of an adequate state remedy," plaintiffs' taking claim should have been dismissed where their breach of contract claims would "vindicate the same rights" (quotations omitted)); *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007) (noting that "[t]he State, in acting within a color of right to take or withhold property in a contractual situation, is acting akin to a private citizen and not under any sovereign powers"). We decline to address this issue in the absence of briefing, however, and leave it to the trial court, should the issue come before it on remand, to address in the first instance.

### F. *Attorney's Fees*

The State notes that Sunapee seeks an award of attorney's fees in this action and argues that we should deny the same because Sunapee "has not presented a single argument in support of such an award." We decline to address this issue, however, because consideration of an attorney's fees award is premature at this stage of the litigation.

*Affirmed in part; reversed in part; vacated in part; and remanded.*

DALIANIS, C.J., and CONBOY, LYNN and BASSETT, JJ., concurred.