NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Public Employee Labor Relations Board
No. 2021-0248

APPEAL OF STATE OF NEW HAMPSHIRE
(New Hampshire Public Employee Labor Relations Board)

Argued: March 15, 2022
Opinion Issued: July 21, 2022

Gary Snyder, of Concord, on the brief and orally, for the State Employees' Association of NH, Inc., SEIU Local 1984.

Nolan Perroni, PC, of North Chelmsford, Massachusetts (Peter J. Perroni on the memorandum of law and orally), for the New England Police Benevolent Association Locals 40 and 45.

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for the State.

DONOVAN, J. The State appeals an order of the New Hampshire Public Employee Labor Relations Board (PELRB) ruling that the State committed unfair labor practices, in violation of RSA 273-A:5, I (2010), when the Governor: (1) sent an email to all state employees concerning collective

bargaining negotiations involving the State; and (2) refused to send the report of a neutral fact finder to the Executive Council for its consideration. We conclude that the State did not commit unfair labor practices and that the PELRB erred by concluding otherwise. Accordingly, we reverse and remand.

## I. Facts

The following facts were found by the PELRB or are otherwise undisputed. The Unions — State Employees' Association of New Hampshire, SEIU Local 1984 (SEA) and New England Police Benevolent Association, Locals 40 and 45 (NEPBA) — represent several state employee bargaining units. In December 2018, the Unions and the State began negotiating a multi-year collective bargaining agreement. After the negotiations reached an impasse, the parties proceeded to impasse resolution procedures and engaged a neutral fact finder to assist them with resolving their disputes. See RSA 273-A:12 (Supp. 2021). In November 2019, the fact finder issued a report making recommendations for resolving the impasse.

The State rejected the fact-finder's report and recommendations, and NEPBA accepted them. The State also submitted an alternative proposal, which the Unions declined. In late 2019, SEA announced its intention to hold a membership vote on the report pursuant to RSA 273-A:12, II. On December 3, 2019, prior to its membership vote, SEA held an informational meeting with its members regarding the negotiations. Approximately ninety minutes before the informational meeting, the Governor sent an email to all state employees — including employees of the bargaining units represented by the Unions — concerning the fact-finder's report and the State's proposal. The full text of the Governor's email is set forth in the Appendix to this opinion.

Following the Governor's email, SEA began receiving inquiries from its members regarding the fact-finder's report. According to SEA, the "[c]allers were angry and confused," and "[m]any believed the Governor tried to mislead them to get them to vote against the fact-finder's report." Ultimately, SEA's members voted to accept the report. On December 5, the State posted a link to the Governor's email on an internet portal accessible by state employees. On December 18, the Governor announced that he would not send the fact-finder's report to the Executive Council pursuant to RSA 273-A:12, II.

Thereafter, the Unions filed unfair labor complaints with the PELRB alleging that the State committed unfair labor practices when the Governor sent the email to state employees and refused to send the fact-finder's report to the Executive Council. The PELRB consolidated the cases, and, in February 2021, issued an order ruling that the State engaged in unfair labor practices in violation of RSA 273-A:5, I. The PELRB concluded that the Governor's email constituted direct dealing, see RSA 273-A:5, I(e), and interfered with union members' rights and the administration of union business, see RSA 273-A:5,

2

I(a), (b).  The PELRB also concluded that the email constituted a direct presentation to union members in violation of RSA 273-A:12, I(a), and, thus, was an unfair labor practice under RSA 273-A:5, I(g).

With respect to the Governor's refusal to send the fact-finder's report to the Executive Council, the PELRB concluded that the Governor was obligated to send the report pursuant to RSA 273-A:12, II, and, therefore, his refusal to do so was also an unfair labor practice.  See RSA 273-A:5, I(g).  The State filed a motion for reconsideration, which was denied.  This appeal followed.

## II. Standard of Review

RSA chapter 541 governs our review of PELRB decisions.  See RSA 273-A:14 (2010).  We will not set aside the PELRB's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that such order is unjust or unreasonable.  Appeal of SEA (Sununu Youth Services Center), 171 N.H. 391, 394 (2018); see RSA 541:13 (2021).  The PELRB's factual findings are presumed prima facie lawful and reasonable.  Appeal of SEA, 171 N.H. at 394; see RSA 541:13.  Accordingly, our task is not to determine whether we would have found differently or to reweigh the evidence, but, rather, to determine whether the PELRB's findings are supported by competent evidence in the record.  Appeal of SEA, 171 N.H. at 394.

Resolving this appeal also requires that we interpret several provisions of RSA chapter 273-A.  Statutory interpretation presents a question of law, which we review de novo.  See Appeal of New England Police Benevolent Ass'n, 171 N.H. 490, 493 (2018).  When examining statutory language, we ascribe the plain and ordinary meaning to the words used in the statute.  Id.  We do not consider words and phrases in isolation, but, rather, within the context of the statute as a whole.  Id.  We construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result.  Id.  Furthermore, we interpret the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Id.  If the language of the statute is clear and unambiguous, we will not look beyond the language of the statute to determine its meaning.  Id. at 493-94.

## III. Analysis

### A. Governor's Email

The State first argues that the PELRB erred by ruling that the Governor's email interfered with state employees' rights and the administration of union business in violation of RSA 273-A:5, I(a) and (b).  We agree.

RSA 273-A:5, I, prohibits public employers from, among other things, "restrain[ing], coerc[ing] or otherwise interfer[ing] with its employees in the

3

exercise of the rights conferred by this chapter," RSA 273-A:5, I(a), and from "dominat[ing] or . . . interfer[ing] in the formation or administration of any employee organization," RSA 273-A:5, I(b). In Appeal of City of Portsmouth, Board of Fire Commissioners, 140 N.H. 435 (1995), we addressed the issue of "what speech constitutes 'interference' within the meaning of RSA chapter 273-A." Appeal of City of Portsmouth, 140 N.H. at 438. In that case, the PELRB ruled that a public employer violated RSA 273-A:5, I(a) and (b) when the employer made statements to a local newspaper about her views on union activities. Id. at 436-37. In reaching its decision, the PELRB determined that the employer's statements had "a disruptive effect" on union members and the administration of union business by "creat[ing] doubt in the effectiveness and truthfulness of the union leadership." Id. at 437 (quotations omitted). We reversed the PELRB's ruling, holding that, because the employer's statements "did not contain elements of 'intimidation, coercion, or misrepresentation,'" the employer did not violate RSA 273-A:5, I(a) or (b). Id. at 439. We further explained that, under RSA 273-A:5, I(a) and (b), "[p]roof of disruptive effect, whether intended or not and whether justified or not, does not amount to, or rise to the level of, interference." Id. (quotations omitted).

Similarly, in Appeal of AFL-CIO Local 298, 121 N.H. 944 (1981), we held that a public employer did not violate RSA 273-A:5, I(a) and (b) by mailing a letter to its employees three days before a union representation election. AFL-CIO Local 298, 121 N.H. at 946-47. We reasoned that the letter "did not contain any threats that employees would lose their jobs or be the victims of retaliation by the [employer]." Id. at 946. We also rejected the union's argument that "it did not have sufficient time to respond to the [employer's] letter by mailing a rebuttal letter," noting that RSA 273-A:5 does not impose "reasonable time, place and manner limitations" and citing the PELRB's observation that "there was no evidence that personal delivery to employees or other means of communications were not available [to the union] up to and including the day of election." Id. (quotation and emphasis omitted).

In light of our decisions in Appeal of City of Portsmouth and Appeal of AFL-CIO Local 298, we conclude that the Governor's email did not violate RSA 273-A:5, I(a) and (b). The email "did not contain any threats that employees would lose their jobs or be the victims of retaliation" if they voted in favor of the fact-finder's report. AFL-CIO Local 298, 121 N.H. at 946; see Appeal of City of Portsmouth, 140 N.H. at 439. That the Governor sent the email shortly before SEA's informational meeting is insufficient to constitute interference, as RSA 273-A:5 does not contain "reasonable time, place and manner limitations" and there is no evidence that SEA lacked an opportunity to respond to the Governor's email prior to the membership vote. AFL-CIO Local 298, 121 N.H. at 946. Indeed, the record demonstrates that SEA had an opportunity to respond to the Governor's email at the informational meeting, which was intended to inform SEA's members about the fact-finder's report and the State's proposal "so that [they could] make an educated decision."

4

(Quotation omitted.)  Moreover, to the extent that the Governor's email may have caused anger and confusion among some of SEA's members, we have held that "[p]roof of disruptive effect" is insufficient to constitute interference. Appeal of City of Portsmouth, 140 N.H. at 439 (quotation omitted).

Nonetheless, the Unions argue that "the Governor's comments were at minimum a misrepresentation," and, therefore, the email constituted interference.  We disagree.  As explained above, in Appeal of City of Portsmouth, we held that an employer's communication with its employees does not constitute interference under RSA 273-A:5, I(a) and (b) unless it "contain[s] elements of intimidation, coercion, or misrepresentation."  Appeal of City of Portsmouth, 140 N.H. at 439 (quotation omitted).  A misrepresentation is a false factual assertion.  See Black's Law Dictionary 1091 (9th ed. 2009) (defining "misrepresentation" as "an assertion that does not accord with the facts").  However, for the purposes of RSA 273-A:5, I(a) and (b), the fact that an employer's communication may contain a misrepresentation is not alone sufficient to establish that the communication constitutes interference.  In such cases, we must consider whether the misrepresentation has a tendency to coerce employees or to unduly influence unions in their formation or administration.  See RSA 273-A:5, I(a)-(b); see also 48A Am. Jur. 2d Labor and Labor Regulations § 1336, at 215 (2005) ("[T]he issue is not the label placed on the employer's action, but whether the action tends to coerce or not or, considered from the employees' point of view, whether the action had a reasonable tendency to coerce . . . ."); 48A Am. Jur. 2d Labor and Labor Regulations § 1478, at 305 ("Employer domination or interference . . . pertains to undue employer influence upon labor organizations in connection with the collective-bargaining process.").

To support their argument, the Unions point to the Governor's statement that, upon receiving the fact-finder's report, he "instructed State negotiators to put forward a proposal that was nearly identical to the fact-finder's conclusions and heavily favored the union leadership's requests."  The Unions also rely upon the Governor's statement that the State's proposal included "nearly all the fact-finder's recommendations, with the exception of a single recommendation to re-open an old contract that had previously been agreed upon in good faith by all parties."  The Unions argue that these statements were misrepresentations because, when considered in light of the specific items that the Governor identified in the email as part of the State's proposal, they "severely downplay[ed] the value and significance of the State's wage proposals compared to what the fact finder recommended."  The Unions further argue that the email misstated the extent to which the State would have absorbed increased healthcare costs under the State's proposal.

Even assuming that the Governor's email misrepresented the extent to which the State's proposal differed from the fact-finder's report, we conclude that any such misrepresentation was not part of an attempt to coerce

employees to reject the fact-finder's report or otherwise to exert undue influence upon SEA's membership vote. Although the Governor expressed his "hope" that the Unions would "reconsider the many valuable benefits that the state's proposal offers to state employees," his email did not expressly characterize the State's proposal as superior to the fact-finder's report, and it did not expressly urge employees to vote against the report. Nor did the Governor specifically identify his misgivings with the report, noting only that the State's proposal excluded "a single recommendation to re-open an old contract." Nothing in the Governor's email attempted to portray the excluded recommendation as disadvantageous to employees. To the contrary, the Governor stated that "the fact-finder's report is fair and shares my appreciation for [the employees'] hard work and commitment to our state." Thus, even if the Governor minimized some of the differences between the State's proposal and the fact-finder's report, he did not represent the report as less favorable to employees than the State's proposal. We therefore conclude that, because the statements did not have a tendency to intimidate or coerce employees to reject the fact-finder's report or otherwise to unduly influence SEA's membership vote, the statements did not constitute interference under RSA 273-A:5, I(a) and (b).

SEA also points to the Governor's statement that the fact finder "worked to help [the parties] reach a compromise." It argues that this statement was a misrepresentation because, "at the time of sending the email, no compromise had been reached, and the parties were still at an impasse." Again, we disagree. Contrary to the Unions' argument, this statement did not suggest that, at the time the Governor sent the email, the parties had reached an agreement. Rather, the statement merely described the fact finder's role in the negotiations. Moreover, the Governor expressly stated in the email that the State had reached an agreement with only two of the unions and that it was still negotiating with "the remaining unions." Thus, when considered in light of the rest of the email, this statement was not a misrepresentation. We therefore conclude that the PELRB erred by ruling that the Governor's email constituted interference in violation of RSA 273-A:5, I(a) and (b).

Next, the State challenges the PELRB's ruling that the Governor's email constituted direct dealing in violation of RSA 273-A:5, I(e). RSA 273-A:5, I(e) prohibits public employers from "refus[ing] to negotiate in good faith with the exclusive representative of a bargaining unit." Accordingly, a public employer must refrain from negotiating with any union member who is not designated as an exclusive representative. Appeal of Town of Hampton, 154 N.H. 132, 134 (2006). "Dealing directly with employees is generally forbidden because it seriously compromises the negotiating process and frustrates the purpose of RSA chapter 273-A." Id. (quotation and brackets omitted). However, an employer does not commit a per se unfair labor practice by merely communicating with its employees. Id. "The fundamental inquiry . . . is

6

whether the employer has chosen to deal with the Union through the employees, rather than with the employees through the Union." N.L.R.B. v. Pratt & Whitney Air Craft Div., 789 F.2d 121, 134 (2d Cir. 1986) (quotation omitted).

We conclude that the Governor's email did not constitute direct dealing in violation of RSA 273-A:5, I(e). Although, as the Unions point out, the Governor sent the email directly to state employees during the course of the negotiations, the email did not contain threats of retaliation or job loss. Cf. Appeal of Franklin Education Assoc., 136 N.H. 332, 335-37 (1992) (concluding that school board engaged in direct dealing when it sent contracts directly to teachers, without consulting the union, offering lower wages and "indicat[ing] that the teachers could not refuse to sign without risking their jobs"). Nor did the Governor blame the Unions for the impasse or solicit feedback about state employees' views on the negotiations. Cf. Ryan Iron Works, Inc. v. N.L.R.B., 257 F.3d 1, 7 (1st Cir. 2001) (concluding that employer engaged in direct dealing when he "told [an employee] that the failure of negotiations was the Union's fault and actively solicited . . . input" on other employees' views).

Nor, for that matter, did the Governor "encourage employees to come directly to [the State] if they were unhappy with [the Unions]." Americare Pine Lodge Nursing v. N.L.R.B., 164 F.3d 867, 880 (4th Cir. 1999). To the contrary, the Governor acknowledged the Unions' role in the negotiations, announcing that the State had reached an agreement with two other unions and expressing his "hope that the remaining unions will reconsider" the State's proposal. Cf. id. When considered as a whole, nothing in the email indicates that the Governor intended to bypass the Unions and negotiate directly with union members. We therefore conclude that the PELRB erred by ruling that the Governor's email constituted direct dealing in violation of RSA 273-A:5, I(e).

Nonetheless, SEA argues that the Governor's email was direct dealing because, in its view, the email was contrary to RSA 273-A:12, I(a), which sets forth the first step of impasse resolution. The statute provides:

> I. (a) Whenever the parties request the board's assistance or have bargained to impasse, or if the parties have not reached agreement on a contract within 60 days, or in the case of state employees 90 days, prior to the budget submission date, and if not otherwise governed by ground rules:
>
> (1) The chief negotiator for the bargaining unit may request to make a presentation directly to the board of the public employer. If this request is approved by the board of the public employer, the chief negotiator for the board of the public employer shall in turn have the right to make a

presentation directly to the bargaining unit.  The cost of the respective presentations shall be borne by the party making the presentation.

(2) The chief negotiator for the board of the public employer may request to make a presentation directly to the bargaining unit.  If this request is approved by the bargaining unit, the chief negotiator for the bargaining unit shall in turn have the right to make a presentation directly to the board of the public employer.  The cost of the respective presentations shall be borne by the party making the presentation.

RSA 273-A:12, I(a).  If neither party requests the opportunity to make a direct presentation pursuant to RSA 273-A:12, I(a), the parties proceed to the second step of impasse resolution, mediation and fact finding, see RSA 273-A:12, I(b).

SEA argues that, by enacting RSA 273-A:12, I(a), "the legislature chose to limit direct presentations to employees and prohibited them generally, choosing instead to only permit direct presentation to employees under specific limited circumstance[s] described [in the statute]."  In SEA's view, "if direct presentation is permitted under these limited circumstances, but nowhere else, then it must be presumed direct presentation of bargaining proposals and issues is otherwise prohibited."  Thus, SEA argues that, because the State did not request a direct presentation pursuant to RSA 273-A:12, I(a), it was prohibited from communicating directly with its employees about the negotiations during the later stages of impasse resolution.  For these reasons, SEA argues that the PELRB correctly concluded that the Governor's email violated RSA 273-A:12, I(a), and, thus, was an unfair labor practice.

We disagree with the Unions' interpretation of RSA 273-A:12, I(a).  The statute's plain language indicates that the legislature intended RSA 273-A:12, I(a) to encourage discussion between the parties before they proceed to mediation and fact finding, not to limit the parties' communications at later stages in the process.  See RSA 273-A:12; see also Appeal of Town of Hampton, 154 N.H. at 134 ("[T]he mere act of communication by an employer with its employees is not a per se unfair labor practice under RSA 273-A:5.").  Moreover, precluding public employers from communicating with their employees about the negotiations after the initial stages of impasse resolution would contravene the purpose of RSA 273-A:12 — which is to assist the parties in resolving disputes when their negotiations reach an impasse — by disrupting "the free flow of information from both union and employer."  Appeal of City of Portsmouth, 140 N.H. at 438; see also Pratt & Whitney Air Craft Div., 789 F.2d at 134 ("Granting an employer the opportunity to communicate with its employees . . . aids the workers by allowing them to make informed decisions while also permitting them a reasoned critique of their unions' performance.").  We will not presume that the legislature intended this result.

8

See Holt v. Keer, 167 N.H. 232, 239 (2015) ("[W]e construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result." (quotation omitted)).

We therefore conclude that the PELRB erred by ruling that the Governor's email violated RSA 273-A:12, I(a) and constituted an unfair labor practice in violation of RSA 273-A:5, I(a), (b), (e), and (g). Accordingly, we reverse the PELRB's decision on this issue and remand.

B. Submission to the Executive Council

The State next argues that RSA 273-A:12, II did not require the Governor to send the fact-finder's report to the Executive Council, and, therefore, his refusal to do so was not an unfair labor practice. See RSA 273-A:5, I(g) ("It shall be a prohibited practice for any public employer . . . [t]o fail to comply with this chapter or any rule adopted under this chapter."). We agree.

RSA 273-A:12, II provides:

> If either negotiating team rejects the neutral party's recommendations, his findings and recommendations shall be submitted to the full membership of the employee organization and to the board of the public employer, which shall vote to accept or reject so much of his recommendations as is otherwise permitted by law.

For "executive branch state employees," the term "board of the public employer" in RSA 273-A:12, II means "the governor and council." RSA 273-A:1, II(a)(1) (2010). In general, when interpreting statutes, we construe the phrase "governor and council" to mean "the governor with the advice and consent of the council." RSA 21:31-a (2020); see RSA 21:1 (2020).

Our decision in Brouillard v. Governor and Council, 114 N.H. 541 (1974), is instructive. In Brouillard, an advisory commission nominated four individuals to serve as Commissioner of Health and Welfare pursuant to RSA 126-A:4 (Supp. 1973), which provided, in part, that the Commissioner of Health and Welfare "shall be appointed by the governor and council from two or more nominees." Id. at 542-43 (quotation omitted). The Governor sent the nominees' names to the Executive Council, which voted favorably for two of the nominees. Id. The Governor subsequently negated the confirmations, and members of the advisory commission filed a petition for a writ of mandamus, arguing that the Council's favorable vote for one of the nominees constituted an appointment. Id. at 543-45. Rejecting the commission's argument, we explained that "a strict reading of RSA 126-A:4 (Supp. 1973) and RSA 21:31-a would indicate that a person becomes a commissioner after the Council has confirmed an appointment by the Governor." Id. at 546. Nonetheless, we

9

concluded that, because "this result was not contemplated by the Governor and in fact was contrary to his intention when he submitted the names of the nominees to the Council," the Council's vote was not an appointment. Id.

Applying the reasoning of Brouillard to this case, we conclude that, if the Governor rejects a fact-finder's report pursuant to RSA 273-A:12, II, the Executive Council cannot unilaterally accept the report on the State's behalf. See RSA 273-A:12, II; cf. Brouillard, 114 N.H. at 547 ("In accordance with RSA 21:31-a the sole power of appointment lies with the Governor subject to the 'consent of the council.'"). To hold otherwise would undermine the Governor's "sole authority to direct the negotiation process." Appeal of House Legislative Facilities Subcom., 141 N.H. 443, 446 (1996); see RSA 273-A:9, I (Supp. 2021) (providing that "[a]ll cost items and terms and conditions of employment affecting state employees in the classified system generally shall be negotiated by the state, represented by the governor as chief executive" (emphasis added)).

We further conclude that, because the Executive Council cannot override the Governor's rejection of a fact-finder's report, RSA 273-A:12, II does not require the Governor to submit the report to the Council for its consideration. See RSA 273-A:1, II(a)(1); RSA 21:31-a. Our decision in Sunapee Difference v. State of New Hampshire, 164 N.H. 778 (2013), supports this conclusion. In that case, we held that RSA 4:40, I (2020) — which governs the disposal of state-owned property — did not require the Governor to submit an amendment of the parties' lease to the Executive Council. Id. at 790-92. Interpreting "governor and council" in RSA 4:40, I, as consistent with RSA 21:31-a, we concluded that "RSA 4:40 did not require the Governor to present the proposed lease amendment to the Executive Council when he did not approve the amendment himself." Id. at 792. In so holding, we relied upon a Massachusetts case interpreting language similar to RSA 21:31-a as meaning that the Governor is not "'obliged to ask advice, in the first instance, from an official body whose opinion could never relieve him from the duty of deciding.'" Id. at 791 (quoting In re Opinion of the Justices, 78 N.E. 311, 312 (Mass. 1906)).

In light of our holding in Sunapee Difference, we conclude that, if the Governor rejects a fact-finder's report, RSA 273-A:12, II does not require the Governor to submit the report to the Executive Council. The Unions argue that Sunapee Difference is not controlling because "RSA 273-A and RSA 4:40 are substantially different in content and purpose." They further argue that RSA 21:31-a "is not definitive for all statutes" and that adopting the definition of "governor and council" set forth in RSA 21:31-a "would be inconsistent with the intent of the legislature." To support this argument, the Unions rely upon language from Appeal of Derry Education Association, 138 N.H. 69, 73 (1993), that "part of" the purpose of RSA 273-A:12 is "to broaden participation in impasse negotiations and to make the parties vulnerable to the publicity that

will no doubt attend an impasse." (Quotations omitted.)  In the Unions' view, this goal "is not met if the Governor can simply choose to not submit the fact-finder's report to the council for a vote."  We are unpersuaded.

RSA 4:40, I, requires submission of "all requests for the disposal or leasing of state-owned properties" to "the governor and council for approval." RSA 4:40, I.  Notwithstanding this requirement, in Sunapee Difference, we concluded that RSA 4:40, I, did not require the Executive Council's consideration of a lease amendment that the Governor rejected.  See Sunapee Difference, 164 N.H. at 791-92.  Similar to RSA 4:40, I, RSA 273-A:12, II provides, in relevant part: "If either negotiating team rejects the neutral party's recommendations, his findings and recommendations shall be submitted to . . . the board of the public employer, which shall vote to accept or reject so much of his recommendations as is otherwise permitted by law."  (Emphases added.)

We recognize that, unlike RSA 4:40, I, RSA 273-A:12, II, contains the mandatory language "shall be submitted" and "shall vote."  RSA 273-A:12, II; see In the Matter of Bazemore & Jack, 153 N.H. 351, 354 (2006) ("It is a general rule of statutory construction that . . . the word 'shall' makes enforcement of a provision mandatory.").  Nonetheless, as in Sunapee Difference, our construction of the phrase "governor and council," as defined by RSA 21:31-a, informs our interpretation of RSA 273-A:12, II.  See Appeal of New England Police Benevolent Ass'n, 171 N.H. at 493 ("We do not consider words and phrases in isolation, but rather within the context of the statute as a whole . . . ." (quotation omitted)).  That RSA 273-A:12, II mandates submission of the fact-finder's report to "the board of the public employer" does not mean that, in every case involving state employee negotiations, the "board of the public employer" includes the Executive Council.  RSA 273-A:12, II; see RSA 273-A:1, II(a)(1).  Moreover, because, as explained above, the Executive Council cannot unilaterally accept a fact-finder's report that the Governor has rejected, we interpret the phrase "shall vote" in RSA 273-A:12, II as referencing only the Governor under such circumstances.  Thus, although RSA 4:40, I, and RSA 273-A:12, II differ "in content and purpose," our decision in Sunapee Difference is instructive.

We are also unpersuaded by the Unions' reliance upon the legislative goal described in Appeal of Derry, 138 N.H. at 73.  In Appeal of Derry, we held that RSA 273-A:12, III(a) required a school board to submit a fact-finder's report "to [its] legislative body for review, but that the legislative body may not bind the parties by a vote on non-cost items."  Appeal of Derry, 138 N.H. at 73. In reaching that conclusion, we rejected the school board's argument that requiring submission of a fact-finder's report to a legislative body for a non-binding vote would lead to absurd results.  Id. at 72-73.  We explained that "part of [RSA chapter 273-A's] purpose is to broaden participation in impasse negotiations and to make the parties vulnerable to the publicity that will no doubt attend an impasse."  Id. at 73 (quotations omitted).  We further

explained that requiring submission of the report to the legislative body would likely serve this goal by "heighten[ing] public scrutiny of the negotiations" and by "increas[ing] the pressure on the parties to reach agreement." Id.

We conclude that Appeal of Derry is distinguishable because it involved submitting fact-finders' reports to legislative bodies, whereas the question presented in this case involves submitting such reports to the Executive Council. Unlike the Executive Council, legislative bodies have authority to accept or reject cost items set forth in collective bargaining agreements. See RSA 273-A:3, II(b) (Supp. 2021). Because the Executive Council lacks this authority, and therefore has no further role in collective bargaining negotiations, its non-binding vote on a fact-finder's report is less likely to "increase the pressure on the parties to reach agreement." Appeal of Derry, 138 N.H. at 73. Thus, we will not assume that the legislature intended RSA 273-A:12, II to require a non-binding vote of the Executive Council on a fact-finder's report that the Governor has rejected. We therefore conclude that the PELRB erred by ruling that the Governor's refusal to send the fact-finder's report to the Executive Council was an unfair labor practice pursuant to RSA 273-A:5, I(g).

Reversed and remanded.

HANTZ MARCONI, J., and ABRAMSON, J., retired superior court justice, specially assigned under RSA 490:3, concurred; HICKS and BASSETT, JJ., dissented.

HICKS and BASSETT, JJ., dissenting. The New Hampshire Public Employee Labor Relations Board (PELRB) ruled that the State committed unfair labor practices, in violation of RSA 273-A:5, I (2010), when the Governor: (1) refused to submit the report of a neutral fact-finder to the Executive Council for a vote; and (2) sent an email to all state employees concerning collective bargaining negotiations involving the State. The majority concludes that the PELRB erred, and that the State committed no unfair labor practices. We respectfully dissent.

We agree with the majority's summary of the facts and statement of our review standards. We begin by addressing the State's argument that RSA 273-A:12, II (Supp. 2021) did not require the Governor to submit the fact-finder's report to the Executive Council for a vote, and, therefore, his refusal to do so was not an unfair labor practice. See RSA 273-A:5, I(e) & (g).

RSA 273-A:12, II provides:

> If either negotiating team rejects the neutral party's recommendations, his findings and recommendations shall be

12

> submitted to the full membership of the employee
> organization and to the board of the public employer, which
> shall vote to accept or reject so much of his recommendations
> as is otherwise permitted by law.

We agree with the majority that, in regard to "executive branch state employees," the term "board of the public employer" in RSA 273-A:12, II means "the governor and council." RSA 273-A:1, II(a)(1) (2010).

We need look no further than the plain language of the relevant statutes to resolve this issue. When read in conjunction with RSA 273-A:1, II(a)(1), RSA 273-A:12, II provides that the findings and recommendations of the fact-finder shall be submitted to the Governor and Council, which shall vote to accept or reject so much of the fact-finder's recommendations as is otherwise permitted by law. As the majority acknowledges, use of the word "shall" makes enforcement of the provision mandatory. In the Matter of Bazemore & Jack, 153 N.H. 351, 354 (2006). Here, even if we assume that the fact-finder's report was "submitted" to the Governor, it was never submitted to the Council, and the Council never had an opportunity to vote on it. Accordingly, the PELRB correctly concluded that the State failed to comply with the plain requirements of RSA 273-A:12, II.

The State argues that if the statute mandates submission of the fact-finder's report to the Council for a vote, it encroaches upon the Governor's authority under Part II, Article 62 of the State Constitution, and thereby violates the separation of powers among the three branches of state government required by the constitution. See N.H. CONST. pt. I, art. 37. The State contends that under Article 62, the full power and authority to convene the Council falls within the Governor's discretion, and requiring that the fact-finder's report be submitted to the Council for a vote "would fundamentally alter the constitutionally determined roles and responsibilities of the Governor and Executive Council and undermine the proper functioning of this body."

Article 62 provides in part: "And the Governor shall have full power and authority to convene the council, from time to time, at his discretion; and, with them, or the majority of them, may and shall, from time to time hold a council, for ordering and directing the affairs of the state, according to the laws of the land." N.H. CONST. pt. II, art. 62 (emphases added). In addition, the separation of powers provision in the State Constitution expressly recognizes that there must be some overlap among the three branches of government, and we have held that it is violated only when one branch usurps "an essential power of another." State v. Carter, 167 N.H. 161, 166 (2014). Given that statutes are presumed constitutional and will only be declared invalid upon inescapable grounds, Gen. Elec. Co. v. Comm'n, N.H. Dep't of Revenue Admin., 154 N.H. 457, 466 (2006), we are not persuaded that the statute, as we construe it, is inconsistent with Part II, Article 62. Furthermore, even

13

assuming that it is inconsistent as the State contends, we are not persuaded that it usurps "an essential power" of the Governor.

Despite the plain language of RSA 273-A:12, II, the majority concludes that the statute does not require the Governor to submit the report to the Council for its consideration, citing Sunapee Difference v. State of New Hampshire, 164 N.H. 778 (2013). We disagree.

Sunapee Difference dealt with the disposal or leasing of state-owned property, not labor negotiations. At issue was RSA 4:40, I (2020), which provides that requests for the disposal or leasing of state-owned properties are to be submitted "to the governor and council for approval." Interpreting that language, we noted that RSA 21:31-a (2020) defines "governor and council" as "the governor with the advice and consent of the council." We then considered a Massachusetts Supreme Judicial Court opinion holding that the Governor was not obliged to bring before the council an application for pardon when he was plainly of the opinion that no pardon should be granted. We also noted the Massachusetts court's reasoning "'that the responsibility rests primarily upon the Governor to determine as the supreme executive magistrate whether any action is called for, and what action, if any, is desirable; and that the provision for advice of council is a requirement that their approval and concurrence shall accompany the affirmative act and enter into it before it becomes complete and effective.'" Sunapee Difference, 164 N.H. at 791 (quoting Opinion of the Justices, 78 N.E. 311, 312 (Mass. 1906)). Guided by those principles, we concluded that RSA 4:40 "did not require the Governor to present the proposed lease amendment to the Executive Council when he did not approve the amendment himself." Id. at 792.

Sunapee Difference is easily distinguished from the instant case. First, RSA 273-A:12, II mandates not only that the fact-finder's report be submitted to Governor and Council, but also that Governor and Council vote to accept or reject the proposal. Nothing in the statutes construed in Sunapee Difference mandated the Governor and Council to vote to accept or reject the proposed lease amendment there at issue. Thus, unlike in the instant case, in Sunapee Difference there was no legislative mandate requiring Governor and Council to vote.

Second, our holding in Sunapee Difference did not render the references to the Council in RSA 4:40 superfluous. While our holding allowed the Governor to unilaterally determine not to approve a proposal to lease state-owned property, the Governor could not approve such a proposal unilaterally — the Executive Council retained the authority to reject such a request even when the Governor approved it. Thus, our holding did not render the statute's requirement of submission to the Governor and Council for approval a nullity — requests to dispose of or lease state-owned property require the Council's approval.

Here, in contrast, the majority's construction renders language in both RSA 273-A:1, I(a)(1) and RSA 273-A:12, II superfluous. The Governor, as chief executive, has the sole authority to direct the negotiation process. See RSA 273-A:9, I; Appeal of N.H. Troopers Ass'n, 175 N.H. 167, 177 (2022). Thus, the Governor could, without consent of the Executive Council, approve a fact-finder's report and enter into a collective bargaining agreement with a union (subject only to approval of cost items by the legislature). If the majority is correct that there is no reason for the Governor to submit a fact-finder's report that he has rejected to the Council for a non-binding vote pursuant to RSA 273-A:12, II, it follows that there is also no reason for the Governor to submit a fact-finder's report that he has accepted to the Council pursuant to RSA 273-A:12, II in those instances in which the union's negotiating team rejects the report. What, then, is the purpose of defining "board of the public employer" as the Governor and Council, and what is the purpose of providing that a fact-finder's report be submitted to the Governor and Council for a vote? The majority's construction of RSA 273-A:12 negates any substantive role for the Council.

Similarly, the inclusion of the Council in the definition of "board of the public employee" is rendered superfluous by the majority's interpretation. The only roles assigned to the board of the public employer of executive branch state employees are the roles set forth in RSA 273-A:12. And the primary role for the board of the public employer under that statute is to consider and vote upon the fact-finder's report. Yet the majority interprets RSA 273-A:12 as not requiring the Council's participation. In essence, the majority concludes that "board of the public employer" means the Governor alone. This is contrary to our canons of statutory construction. See State v. Parr, 175 N.H. 52, 56 (2022) (stating that we must give effect to all words in a statute, and presume that the legislature did not enact superfluous words).[1]

Third, our holding in Sunapee Difference rested upon the foundation that, under the statutory scheme at issue, the responsibility lay primarily with the Governor to determine "whether any action is called for, and what action, if any, is desirable." Sunapee Difference, 164 N.H. at 791 (quotation omitted). The court declined to construe the statutory definition of "governor and council" in RSA 21:31-a ("the governor with the advice and consent of the council") as mandating that the Governor always seek the Council's advice before determining "whether any action is called for, and what action, if any, is

---

[1] The majority's reliance upon Sunapee Difference is flawed because the definition of "governor and council" applicable to RSA 4:40 is not applicable here. In Sunapee Difference, we concluded that the phrase "governor and council" in RSA 4:40 meant "the governor with the advice and consent of the council." Sunapee Difference, 164 N.H. at 791; see RSA 21:31-a. Under this definition, the Council's approval and concurrence is required in order for a proposal to become effective. That definition does not apply to RSA 273-A:12, II, as it would give the Council the ability to veto the Governor's acceptance of a fact-finder's report.

desirable." In other words, the court concluded that, once the Governor determined that the proposed lease amendment should not be approved under RSA 4:40, I, it would be illogical to construe the statute as requiring him to submit the proposed amendment to the Council for a vote. See id. Quoting from the above-referenced Massachusetts case, the court noted that "[n]othing could ever be gained by asking the council to give advice under such conditions." Id. (quotation omitted).

Here, by contrast, the legislature has specifically addressed the question of whether the fact-finder's report should be submitted for a vote. RSA 273-A:12, II does not involve a responsibility that rests primarily upon the Governor to determine, "as the supreme executive magistrate," whether any action is called for, and what action, if any, is desirable. Id. (quotation omitted). Under the Public Employee Labor Relations Act, the State is "represented by the governor as chief executive," RSA 273-A:9, I. The Governor exercised his responsibility as "supreme executive magistrate" when he rejected the fact-finder's report. It was that action that triggered the requirement in RSA 273-A:12, II that the report be submitted to the Governor and Council for a vote. It is incongruous at best to construe RSA 273-A:12, II as requiring only that the Governor, who just rejected the fact-finder's report, unilaterally decide whether to submit that same report to the Council for a vote. If the statute permits the Governor, who just rejected the fact-finder's report, to unilaterally decide to take no action on that same report, then the statute serves no purpose. To paraphrase Sunapee Difference, nothing could ever be gained by requiring the Governor to "submit" a report, which he has just rejected, to himself alone, for his "vote" to accept or reject it. That would be nonsensical, yet that is how the majority construes the statute.

RSA 273-A:12 is part of a statutory scheme governing labor relations that is intended to assist parties in reaching agreement on a contract. In Sunapee Difference, we concluded, for good reason, that if the Governor did not approve of a proposal to dispose of or lease state-owned property, then nothing would be gained by requiring him to submit the proposal to the Council. That was reasonable because under RSA 4:40, the Governor's decision was final — he was under no obligation to continue to attempt to reach agreement with the party seeking to obtain or lease the property in question. Here, however, the Governor's decision to reject the fact-finder's report does not end the matter — the Governor continues to be obliged to negotiate in good faith towards the goal of reaching agreement on a contract. RSA 273-A:3, I. Submission of the fact-finder's report to the Council, resulting in the expression of the Council's position on the report, is one step mandated by the legislature to assist the parties in ultimately reaching an agreement. Even though the Governor, as chief executive, previously rejected the report, RSA 273-A:12, II still requires that the report be submitted to the Governor and Council for a vote — the advice and vote of the Council, while non-binding, may aid the Governor in reconsidering his position or in formulating new proposals in his continuing

16

efforts, required by RSA 273-A:3, to reach agreement on a contract.  Thus, the rationale supporting the result in Sunapee Difference does not apply here, where the Governor has an ongoing duty to negotiate in good faith in order to reach agreement on a contract.

Moreover, our case law makes clear why the legislature included the requirement in RSA 273-A:12, II that the Governor and Council vote on the report.  In Appeal of Derry Education Association, we considered whether RSA 273-A:12, III(a) requires a school board to submit a fact-finder's report on only non-cost items to its legislative body for review, even though the legislative body cannot bind the parties by a vote on non-cost items.  Appeal of Derry Educ. Assoc., 138 N.H. 69, 73 (1993).  To answer that question, we examined legislative history and determined that part of RSA 273-A:12's purpose is to broaden participation in impasse negotiations and to make the parties vulnerable to the publicity that will no doubt attend an impasse.  Id. at 73.  Noting that submission of the fact-finder's report to the legislative body in Appeal of Derry would likely heighten public scrutiny of the negotiations and could increase the pressure on the parties to reach agreement, we construed the statute as requiring that the report be submitted.

Here, requiring that the fact-finder's report be submitted to the Governor and Council for their consideration and a vote furthers that same purpose.  As was true in Appeal of Derry, submission of the report to the Council for a non-binding vote can heighten public scrutiny of the negotiations, and the expression of the Executive Council's position on the report can increase the pressure on the parties to reach agreement.  See id.  Thus, it is not the case here that nothing could ever be gained by asking the Council to give advice and vote simply because the Governor has rejected the fact-finder's report.  Indeed, the statutory scheme anticipates that the Governor may have already rejected the report when RSA 273-A:12, II comes into play — the statute is intended to require submission to and a vote by the Council despite the fact that the Governor has already rejected the report.

The majority attempts to distinguish Appeal of Derry on the ground that it involved submitting a fact-finder's report to a legislative body, arguing that unlike the Executive Council, legislative bodies have authority to accept or reject cost items set forth in collective bargaining agreements.  See RSA 273-A:3, II(b) (Supp. 2021).  The majority concludes that because the Executive Council lacks this authority, its non-binding vote on a fact-finder's report is "less likely" to increase the pressure on the parties to reach agreement.  Appeal of Derry, 138 N.H. at 73.  This attempt fails for two reasons.

First, the fact-finder's report in Appeal of Derry involved purely non-cost items.  The court explained that the legislative body's vote on non-cost items was not binding — school boards, not legislative bodies, have authority to negotiate and enter into collective bargaining agreements.  Thus, nothing

17

supports the majority's speculation that a non-binding vote of the Executive Council on a fact-finder's report is less likely to increase the pressure on the parties to reach agreement than the non-binding vote of the legislative body on the fact-finder's report in Appeal of Derry.

Second, it is not the court's role to second-guess the legislature. Matters of public policy are reserved for the legislature. In the Matter of Plaisted & Plaisted, 149 N.H. 522, 526 (2003). The legislature has determined that the Governor and Council "shall vote to accept or reject" the fact-finder's report, and doing so furthers the legislature's purpose in enacting RSA 273-A:12, II. Whether that legislative purpose is "less likely" to be fulfilled here than in other factual situations is not a sound reason to construe the statute so that it is directly at odds with both its plain language and acknowledged purpose.

We conclude that the plain language of RSA 273-A:12, II required submission of the fact-finder's report to the Council for a vote. Requiring such a vote furthers the purpose of RSA 273-A:12, II. Moreover, construing the statute as permitting the Governor, after rejecting a fact-finder's report, to unilaterally refer the same report to himself absent advice or input from the Council renders the statute nonsensical. Accordingly, we would affirm the PELRB's determination that the State committed an unfair labor practice when the Governor refused to submit the fact-finder's report to the Executive Council for a vote.

We now turn to the second issue presented by this appeal. The State argues that the PELRB erred by ruling that the Governor's email interfered with state employees in the exercise of their rights under RSA chapter 273-A. Again, we respectfully disagree.

RSA 273-A:5, I(e) prohibits public employers from refusing "to negotiate in good faith with the exclusive representative of a bargaining unit." "Dealing directly with employees is generally forbidden because it seriously compromises the negotiating process and frustrates the purpose of RSA chapter 273-A." Appeal of Town of Hampton, 154 N.H. 132, 134 (2006). In addition, RSA 273-A:5, I, prohibits public employers from, among other things, "restrain[ing], coerc[ing] or otherwise interfer[ing] with its employees in the exercise of the rights conferred by this chapter," RSA 273-A:5, I(a).

In Appeal of City of Portsmouth, the court addressed the issue of "what speech constitutes 'interference' within the meaning of RSA chapter 273-A." Appeal of City of Portsmouth, 140 N.H. 435, 438 (1995). As the majority explains, in that case the court held that, because the employer's statements "did not contain elements of 'intimidation, coercion, or misrepresentation,'" the union failed to demonstrate "interference . . . within the meaning of RSA 273-A:5, I(a) and (b)." Id. at 439 (emphasis added).

18

Here, the Unions contend that the Governor's email contained several misrepresentations, including the Governor's statement that, upon receiving the fact-finder's report, he "instructed State negotiators to put forward a proposal that was nearly identical to the fact-finder's conclusions and heavily favored the union leadership's requests," and his statement that the State's proposal included "nearly all the fact-finder's recommendations, with the exception of a single recommendation to re-open an old contract that had previously been agreed upon in good faith by all parties." The Unions further argue that the email misstated the extent to which the State would have absorbed increased healthcare costs under the State's proposal.

We note, as does the majority, that our task on appeal is not to determine whether we would have found differently from the PELRB or to reweigh the evidence, but, rather, to determine whether the PELRB's findings are supported by competent evidence in the record. Appeal of SEA (Sununu Youth Services Center), 171 N.H. 391, 394 (2018). Here, the PELRB found that the email "includes language designed to align the State's proposal with the fact finder's recommendations even though there are clear substantive differences between the two, particularly with respect to wages." This finding is supported by competent evidence in the record. Most significant is the statement in the Governor's email that the State had "proposed nearly all the fact-finder's recommendations, with the single recommendation to re-open an old contract that had previously been agreed upon in good faith by all parties." As the PELRB aptly stated, "It is difficult to reconcile this characterization with the fact that the fact finder recommended a wage increase of 2.86% in year 1 and 1.16% in year 2 whereas the proposal outlined in the Governor's email offers 1.16% in year 1 and 1.16% in year 2."

If the majority could have found that the Governor's email did not contain a misrepresentation, it would have said so. That it did not so find, is, therefore, telling. Instead, the majority concludes that "[e]ven assuming that the Governor's email misrepresented the extent to which the State's proposal differed from the fact-finder's report, . . . any such misrepresentation was not part of an attempt to coerce employees to reject the fact-finder's report or otherwise to exert undue influence upon SEA's membership vote." The PELRB ruled, however, that the email constituted "a direct presentation of the State's bargaining position to the bargaining unit made in an effort to convince employees to pressure the unions to accept the State's bargaining proposal, reject the fact-finder's report, and reject any contrary recommendations from the unions." This ruling is neither unjust nor unreasonable, and is supported by competent evidence in the record. See RSA 541:13 (2021).

The email was sent directly to bargaining unit employees using work email, and soon thereafter a link to the email was posted on the NH First web portal regularly accessed by state employees. It contained at least one material, misleading statement. It was sent just 90 minutes before the SEA's

scheduled informational meeting on the fact-finder's recommendations.  It captured, as the PELRB stated, "the essence of what a bargaining presentation made directly to employees . . . might be expected to include."  And it expressed the Governor's hope that a new contract based on the State's proposal could soon be delivered.  Thus, we do not agree with the majority that the misleading statements in the email were "not part of an attempt to coerce employees to reject the fact-finder's report or otherwise to exert undue influence upon SEA's membership vote."

Because we agree with the PELRB that the State committed unfair labor practices by failing to submit the fact-finder's report to the Executive Council for a vote in violation of RSA 273-A:12 and by sending the December 3 email, we respectfully dissent.

20

# Appendix

JOINT Ex. 4

241

(C) Joint Exhibit - Governor's Email

**From:** State of New Hampshire - Broadcast <SoNH.Broadcast@nh.gov>
**Sent:** Tuesday, December 3, 2019 4:32 PM
**Subject:** Message from the Governor

Dear fellow state employee:

As you know, the State has been in negotiations with union leadership for several months to find agreement on a new state employee contract.

Last week, the negotiations reached a new phase when both parties received a report from an independent fact-finder who worked to help us reach a compromise. Upon receiving that report, I instructed State negotiators to put forward a proposal that was nearly identical to the fact-finder's conclusions and heavily favored the union leadership's requests.

Our proposal provides you with higher wages and better benefits, almost double the $6 million authorized by the Legislature in the state budget. I believe that the fact-finder's report is fair and shares my appreciation for your hard work and commitment to our state.

We have proposed nearly all the fact-finder's recommendations, with the exception of a single recommendation to re-open an old contract that had previously been agreed upon in good faith by all parties. Our proposal includes the following items totaling $11 million in enhanced benefits:
- 1.16% wage increase in 2020 and another 1.16% wage increase in 2021
- An average of 6.4% increased costs associated with health care benefits and 2.5% increase in dental plan rates absorbed by the State with no increase to employees
- Increase hazardous duty pay by 20% (from $25 to $30)
- Double direct care pay ($5 to $10) for those working in 24 hour facilities
- Increase longevity payments 17% by $50 from $300 to a new amount of $350
- Expand insurance coverage to cover developmental disorders for children
- Expand employee discounts at State recreational areas to allow a discount for one guest.

So far, I am pleased to announce that we have reached an agreement based upon the fact-finder's recommendations with the Teamsters and the Liquor Investigators that reflects that the needs of our state employees are a top priority.

It is my hope that the remaining unions will reconsider the many valuable benefits that the state's proposal offers to state employees. It is my hope that we can deliver a new contract soon based upon our proposal that reflects our state's priorities and the hard work of our state employees.

As noted above, our proposal is estimated to cost $11 million in FY20 and FY21 – $5 million more than had been allocated by the state budget. I was happy to roll up my sleeves and find the additional funding within state government because I understand that our state employees are the backbone of our state and I value your hard work.

This holiday season is a time we can all be grateful to live and work in the greatest state in the country; where we get things done for the benefit of those we serve. Thank you for all you do.

Sincerely,

Chris Sununu
Governor